J-S24002-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RASHAN BOWMAN | |
| Appellant | No. 3394 EDA 2013 |

Appeal from the Judgment of Sentence June 28, 2013
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0007398-2011

BEFORE:  GANTMAN, P.J., ALLEN, J., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED AUGUST 11, 2015**

Appellant, Rashan Bowman, appeals from the judgment of sentence entered in the Delaware County Court of Common Pleas, following his jury trial convictions for second-degree murder, robbery, conspiracy, and firearms not to be carried without a license.[1]  We affirm the convictions, vacate Appellant's mandatory minimum sentence for conspiracy, and remand for resentencing on that conviction only.

The relevant facts and procedural history of this appeal are as follows. On December 13, 2011, Appellant and co-defendant Marcus Cogmon went to Jalil Howard and Tania Campbell's house in Upland, PA.  Jermir Washington

---

[1] 18 Pa.C.S.A. §§ 2502(b), 3701(a)(1)(i), (a)(1)(ii), (a)(1)(iv), 903, and 6106, respectively.

and the victim, Jason Rossiter, were also at the house. The group was drinking alcohol and rapping. At one point, Appellant and the victim engaged in a "rap battle," which became "heated." The victim showed Appellant his money, as if the victim wanted to bet Appellant over the "rap battle." Shortly after 10:00 p.m., Mr. Washington and the victim decided to leave. Appellant and Mr. Cogmon followed Mr. Washington and the victim outside to Mr. Washington's car at the rear of the house. The victim extended his hand to Appellant to "make peace," at which point Mr. Cogmon threw the victim up against Mr. Washington's car and stated, "Give me what you got, give me the money!" The victim complied and handed over his wallet. When Mr. Washington walked toward Mr. Cogmon to help the victim, Appellant pulled out a firearm, pointed it at Mr. Washington, and said, "Back up." Mr. Washington retreated and Mr. Cogmon waved the victim's wallet in front of the victim. When the victim reached for the wallet, Appellant shot the victim. Mr. Washington went to the ground in front of his car and called the police. Mr. Washington then saw a silver or white sedan, which had been parked near his vehicle, drive off.

At around 10:25 p.m., Detective Glen Greenwalt was driving an unmarked police vehicle near the scene of the shooting when he received a radio dispatch regarding the incident. The dispatch provided a general description of the silver or white sedan that had fled from the scene of the shooting. As Detective Greenwalt drove toward the location of the shooting,

a silver Chrysler LHS sedan drove past him. The detective reversed his direction and followed the sedan but did not activate any lights or sirens. The sedan began to accelerate and passed cars by moving into the oncoming lane of travel. The sedan ultimately turned into an alley behind West 21st Street in Chester. The sedan again increased its speed. Detective Greenwalt continued to follow the sedan until it slowed down and the detective saw the front doors open. The detective observed two "shadows" flee from the sedan. The front doors were left open. The unoccupied sedan then drifted into a pole supporting a raised deck, approximately two minutes by car from the location of the shooting. Detective Greenwalt exited his vehicle and proceeded down the alley on foot. He encountered Mr. Cogmon, who denied having fled from the Chrysler sedan. Mr. Cogmon remained on the scene while officers from the K-9 unit arrived and attempted to track the individuals who fled from the sedan. Because the police dog did not approach Mr. Cogmon, Detective Greenwalt allowed Mr. Cogmon to leave. The police subsequently had the Chrysler sedan towed to the Upland police station.

At the police station, Detective Steve Jackson began to process the Chrysler sedan by taking photographs of its exterior. As Detective Jackson was taking photographs, he heard a cellular telephone start ringing inside the car. The detective looked through the driver side rear window and saw a Huawei smartphone. The detective took the cell phone out of the vehicle,

removed its battery, and placed the phone and battery in an electrostatic bag to block wireless signals that could be used remotely to erase the phone's contents. After removing the phone, Detective Jackson did not search the vehicle or phone or seize any other items. On December 14, 2011, Detective Jackson obtained a warrant to search the Chrysler sedan for firearms, cell phones, and related evidence. The police recovered from the vehicle, *inter alia*, identification for Appellant, a Samsung cell phone, and prescription pill bottles bearing Mr. Cogman's name. Metro PCS was the service provider for the Samsung phone. Police also determined the car was registered to Sabrina Bowman.[2] On December 21, 2011, Detective Jackson secured warrants to search the contents of the Huawei and Samsung cell phones. The police were unable to extract data from either phone using forensic techniques. As a result, Detective Jackson manually searched the Huawei phone the same way a person would normally operate it.[3] The detective found an outgoing text message sent at 5:49 p.m. on the evening of the incident, December 13, 2011, which stated: "might rob him when we done." Detective Jackson subsequently obtained a search warrant for Metro

_____

[2] The record is unclear regarding the nature of the relationship, if any, between Appellant and Ms. Bowman.

[3] At trial, Detective Joseph Walsh testified that he could not manually examine the contents of the Samsung phone because the phone was "pattern locked." To access a pattern-locked phone, the user must draw a pattern in a collection of dots across the screen, rather than enter a PIN.

PCS records regarding, *inter alia*, subscriber and account information associated with the phone number that received the text message. Metro PCS provided police with subscriber information (name, address, and account number), which showed the text message had been sent to Appellant on the Samsung cell phone recovered from the Chrysler LHS sedan. The Huawei cell phone belonged to Mr. Cogmon.

Following the filing of criminal charges, Appellant moved to suppress on February 25, 2013, seeking exclusion, *inter alia*, of the subscriber information for the Samsung cell phone and/or telephone number that had received the text message from the Huawei cell phone. On April 24, 2013, the court granted in part and denied in part Appellant's motion to suppress. The court denied the suppression motion with respect to Appellant's subscriber information. A jury subsequently convicted Appellant of second-degree murder, robbery, conspiracy, and firearms not to be carried without a license. On June 28, 2013, the court sentenced Appellant on the second-degree murder conviction to life imprisonment without the possibility of parole. The court sentenced Appellant to a concurrent term of three-and-a-half (3½) to seven (7) years' incarceration for the firearms conviction. The court also imposed a concurrent term of five (5) to twenty (20) years' incarceration on one of the convictions for conspiracy to commit robbery (corresponding to 18 Pa.C.S.A. § 3701(a)(1)(ii) (threatens another with or intentionally puts him in fear of immediate serious bodily injury)).

Appellant's robbery convictions and remaining conspiracy convictions merged for sentencing. On July 8, 2013, Appellant filed timely post-sentence motions, which the court denied on October 28, 2013. Appellant filed a timely notice of appeal on November 27, 2013. The court ordered Appellant to file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b); Appellant timely complied.

Appellant raises the following issues for our review:

> WHETHER THE HONORABLE TRIAL COURT COMMITTED LEGAL ERROR AND ABUSE OF DISCRETION, AND VIOLATED RIGHTS GUARANTEED BY THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 8 OF THE PENNSYLVANIA CONSTITUTION, IN DENYING APPELLANT'S PRE-TRIAL MOTION TO SUPPRESS, AS EVIDENCE, SUBSCRIBER AND TELEPHONE NUMBER INFORMATION RELATING TO HIS SAMSUNG SCHR910 CELLULAR TELEPHONE, WHERE THE AFFIDAVIT OF PROBABLE CAUSE FAILS TO SET OUT PROBABLE CAUSE FOR THE ISSUANCE OF THE WARRANT, WHERE…APPELLANT HAS A SUBJECTIVE AND OBJECTIVELY REASONABLE EXPECTATION OF PRIVACY IN THIS INFORMATION, THAT WAS NOT DEFEATED BY ABANDONMENT OF THE AUTOMOBILE IN WHICH THE PHONE WAS FOUND OR THE PHONE ITSELF.
>
> WHETHER THE HONORABLE TRIAL COURT COMMITTED ERROR AND ABUSE OF DISCRETION, AND DENIED APPELLANT DUE PROCESS OF LAW AND A FAIR TRIAL, AS GUARANTEED BY THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND APPLICABLE PARALLEL PROVISIONS OF THE PENNSYLVANIA CONSTITUTION, IN DENYING APPELLANT'S MOTION FOR A MISTRIAL, AFTER THE ASSISTANT DISTRICT ATTORNEY REMARKED, DURING CLOSING ARGUMENT, IN REFERRING TO A TEXT MESSAGE SENT FROM A CELL PHONE BELONGING TO CO-DEFENDANT MARCUS COGMON, TO A PHONE BELONGING TO

> APPELLANT, WHICH STATED AN INTENT TO "ROB THEM[,]" THAT IF APPELLANT…AND CO-DEFENDANT COGMON WERE NOT GOING TO ROB THE VICTIM, THEN THEY WERE GOING TO ROB SOMEONE ELSE, A PREJUDICIAL COMMENT ATTRIBUTING TO APPELLANT UNRELATED CRIMINAL BEHAVIOR, THAT WAS NOT IN FAIR RESPONSE TO ANY ARGUMENT OR POSITION TAKEN BY APPELLANT…AT TRIAL.

(Appellant's Brief at 4).

In his first issue, Appellant argues he had a legitimate expectation of privacy in his cell phone number and corresponding subscriber information. Appellant contends the Commonwealth's affidavit in support of its search warrant application failed to establish probable cause that the release of Appellant's subscriber information would yield evidence related to the shooting.[4] Appellant avers the affidavit of probable cause failed to identify the content of the text message sent to the phone number in question and simply declared that the text message "will serve as evidence." Appellant asserts the affidavit also failed to allege facts showing Metro PCS was the service provider for the phone number in question. Appellant further claims it is irrelevant whether he physically abandoned the Samsung phone when he left it in the Chrysler sedan because he still had no intent to abandon his privacy interest in his subscriber information, which was not accessible from

---

[4] Appellant does not challenge on appeal any of the earlier warrants relating to the search of the Chrysler LHS sedan or the cell phones. Appellant challenges only the search warrant granting access to Metro PCS records for subscriber information associated with the telephone number discovered during the search of the Huawei cell phone.

an inspection of the phone itself. Appellant stresses he had a legitimate expectation of privacy in the information he passed to Metro PCS while his cell phone account was active, and this privacy interest was unaffected by whatever Appellant decided to do with the phone physically. Appellant concludes the court erred when it denied his suppression motion with respect to the Metro PCS subscriber information. We disagree.

We review the denial of a suppression motion as follows:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.

> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Williams, H.*, 941 A.2d 14, 26-27 (Pa.Super. 2008) (*en banc*) (internal citations and quotation marks omitted). Further, "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Clemens*, 66 A.3d 373, 378 (Pa.Super. 2013).

"The standard for evaluating whether probable cause exists for the issuance of a search warrant is the 'totality of circumstances' test as set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527

(1983), and adopted by [the Pennsylvania Supreme Court] in *Commonwealth v. Gray*, 509 Pa. 476, 484, 503 A.2d 921, 925 (1985)." *Commonwealth v. Jones*, 542 Pa. 418, 424, 668 A.2d 114, 116 (1995).

> A magistrate is to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. The information offered to establish probable cause must be viewed in a common sense, nontechnical manner and deference must be accorded to the issuing magistrate. The duty of a court reviewing the decision is to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*Id.* at 424, 668 A.2d at 116-17 (internal citations and quotation marks omitted). A magistrate's finding of probable cause must be based on facts described within the four corners of the affidavit. *Commonwealth v. Smith*, 784 A.2d 182 (Pa.Super. 2001).

Instantly, on August 15, 2012, Detective Jackson applied for a search warrant to obtain subscriber information from Metro PCS for the phone number that received the text message, "might rob him when we done." The affidavit explained the following. Two individuals were involved in the robbery and shooting of the victim on the night of December 13, 2011. The victim's friend, Jermir Washington, saw the perpetrators flee in a silver or white sedan. Shortly thereafter, Detective Greenwalt was approaching the scene of the incident when a silver Chrysler sedan sped past him. The detective followed the sedan, which turned into an alley and crashed. The

occupants fled on foot. The location where the suspects fled the sedan was a two-minute drive from the scene of the shooting. The sedan was registered to someone with the same last name as Appellant. Appellant's brother told police Appellant had been involved in a shooting. From inside the Chrysler sedan, police recovered a Huawei cell phone. Pursuant to a search warrant, Detective Jackson viewed text messages on the phone and observed a message sent on the night of the shooting. Detective Jackson stated in the affidavit that based on his knowledge and experience in similar investigations, fleeing suspects often communicate with each other about their criminal acts and leave behind cell phones and other evidence in the vehicles they use to escape from police. Detective Jackson further stated that the text message, and the subscriber information for the phone number that received it, would serve as evidence with respect to the robbery/homicide. Consequently, Detective Jackson requested subscriber information associated with the phone number, serviced by Metro PCS, that received the text message in question.

Under the totality of the circumstances, Detective Jackson presented sufficient information in the affidavit of probable cause for the magistrate to determine there was a fair probability the search warrant would lead to evidence related to the robbery and killing of the victim. **See Jones, supra**. The affidavit stated that two individuals were involved in the crime. Detective Jackson averred that the text message in question, which was sent

earlier on the same night the robbery/homicide occurred, would serve as pertinent evidence in this case. The affidavit identified the phone number that received the text message. Consequently, there was a fair probability that a search of subscriber information for that phone number would yield relevant evidence, *e.g.*, the identity of an individual involved in the crime. In light of our deferential standard, and viewing the information in the affidavit in a common sense and nontechnical manner, we conclude the magistrate had a substantial basis to determine probable cause existed. *See id.* Therefore, Appellant's first issue merits no relief.

In his second issue, Appellant argues the prosecutor made a highly prejudicial comment during closing argument. Appellant asserts that, when discussing Mr. Cogmon's text message to Appellant ("might rob him when we done"), the prosecutor improperly remarked that if Appellant and Mr. Cogmon were not going to rob the victim, "who the hell were they going to rob?" (Appellant's Brief at 37 (quoting N.T. Trial, 5/2/13, at 144)). Appellant contends the comment was prejudicial because it alluded to separate and unrelated crimes potentially contemplated by Appellant and Mr. Cogmon. Appellant disputes the notion that the remark was in fair response to defense counsel's attempt to discredit Mr. Washington's testimony that Appellant and Mr. Cogmon arrived at Mr. Howard's house before the text message was sent. Appellant insists his purpose was to attack the credibility of Mr. Washington, who claimed to have witnessed the robbery/homicide,

and not to suggest that Appellant and Mr. Cogmon intended to rob somebody else. Appellant concludes the prosecutor's remark deprived Appellant of due process and entitles him to a new trial. We disagree.

The following principles govern our review of a claim of prosecutorial misconduct:

> In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one.
>
> Not every unwise remark on a prosecutor's part constitutes reversible error. Indeed, the test is a relatively stringent one. Generally speaking, a prosecutor's comments do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward [the defendant] so that they could not weigh the evidence objectively and render a true verdict. Prosecutorial misconduct, however, will not be found where comments were based on evidence or proper inferences therefrom or were only oratorical flair. In order to evaluate whether comments were improper, we must look to the context in which they were made.

*Commonwealth v. Harris*, 884 A.2d 920, 927 (Pa.Super. 2005), *appeal denied*, 593 Pa. 726, 928 A.2d 1289 (2007). "A prosecutor has great discretion during closing argument. Indeed, closing 'argument' is just that: argument." *Commonwealth v. Brown*, 911 A.2d 576, 580 (Pa.Super. 2006), *appeal denied*, 591 Pa. 722, 920 A.2d 830 (2007). A prosecutor, however, must limit statements to facts in evidence and reasonable inferences therefrom and must not express personal opinions on a defendant's guilt or credibility. *Commonwealth v. Bricker*, 506 Pa. 571, 579, 487 A.2d 346, 349 (1985). "[T]he prosecutor may comment on the

credibility of witnesses. Further, a prosecutor is allowed to respond to defense arguments with logical force and vigor." ***Commonwealth v. Chmiel***, 585 Pa. 547, 620, 889 A.2d 501, 544 (2005), *cert. denied*, 549 U.S. 848, 127 S.Ct. 101, 166 L.Ed.2d 82 (2006) (internal citations omitted). ***See also Commonwealth v. Kelly***, 465 A.2d 1301 (Pa.Super. 1983) (stating prosecution may, in closing argument, attempt to meet arguments made by defense counsel).

A new trial is required "only when a prosecutor's improper remarks are prejudicial, *i.e.*, when they are of such a nature or delivered in such a manner that they may reasonably be said to have deprived the defendant of a fair and impartial trial." ***Commonwealth v. Davis***, 554 A.2d 104, 111 (Pa.Super. 1989), *appeal denied*, 524 Pa. 617, 571 A.2d 380 (1989). The "determination whether the prosecutor's remarks were unfairly prejudicial rests within the sound discretion of the trial court and our inquiry of necessity must turn to whether an abuse of discretion was committed." ***Commonwealth v. Correa***, 664 A.2d 607, 609 (Pa.Super. 1995), *appeal denied*, 544 Pa. 673, 678 A.2d 364 (1996).

Instantly, throughout trial, the Commonwealth and Appellant's and Mr. Cogmon's defense attorneys repeatedly referenced the time periods that Appellant, Mr. Cogmon, Mr. Washington, and the victim arrived at Mr. Howard's residence on December 13, 2011, the day of the incident. During cross-examination of Mr. Washington, Appellant's counsel asked questions

regarding when Mr. Washington and the victim arrived at Mr. Howard's residence, to which Mr. Washington replied, "sometime like around 3:30, 4:00." (N.T. Trial, 4/29/13, at 16). Counsel also questioned Mr. Washington as to when Mr. Howard called Appellant or Mr. Cogmon, when Appellant and Mr. Cogmon arrived, and how long the "rap battles" and other activities lasted. After defense counsel finished having Mr. Washington provide an overview of the events and timeline of the day of the incident, counsel directed Mr. Washington to read from portions of his testimony from the preliminary hearing on February 22, 2012. This prior testimony included Mr. Washington's statement that it was not until 6:00 p.m. that he and the victim received a telephone call to go to Mr. Howard's residence. Defense counsel likewise elicited Mr. Washington's preliminary hearing testimony that Appellant and Mr. Cogmon arrived at approximately 7:00 p.m.

During redirect examination, the prosecutor responded to defense counsel's line of questioning by asking Mr. Washington additional questions related to the timeline of events. Mr. Washington testified that he purchased a bottle of vodka at a wine and spirits store at 2:35 p.m. The Commonwealth introduced a store receipt in support of that testimony. Mr. Washington stated he then went to a Wawa store to purchase cigarettes before going to the victim's residence. Mr. Washington and the victim stayed there for approximately twenty to thirty minutes before proceeding to Mr. Howard's residence, which took around thirty minutes. Ms. Campbell,

who lived at the residence with Mr. Howard, testified that she arrived home around 4:00 p.m. and Mr. Washington and the victim were already there. When asked what time Appellant and Mr. Cogmon arrived, Ms. Campbell stated, "I think it was like a couple hours later." *Id.* at 221. Detective Jackson testified that when he searched Mr. Cogmon's Huawei cell phone, he discovered a text message sent at 5:49 p.m. on the day of the incident, which stated, "might rob him when we done." (N.T. Trial, 5/1/13, at 229). The message was sent to a phone registered to Appellant.

During closing argument, Appellant's counsel commented on the evidence regarding the timeline of events on December 13, 2011, as follows:

> We know that on February 22, 2012, [Mr. Washington] testified that he got a phone call from Jalil Howard to go over to his house somewhere around 6:00 in the afternoon and remember, I read that whole passage to him. I didn't just start with the question what time did you get the call. I took him through [Mr. Cogmon's counsel,] Mr. Reynolds[,] asking him, begging him, look, if you don't understand the question say so, I'll rephrase it. If you don't know, say so. If you don't know the answer, say you don't know. That's an acceptable answer. All we want is honest answers. What time did you get the call to go to Jalil Howard's? 6:00. 6:00. Not, I don't know. I don't know, I'd have to look at the receipt from the liquor store, from the Vodka bottle I bought, you know, I'm really foggy. It might have been a little dark. I was at [the victim's] for a half-hour. I really don't know what time it was I got there. He didn't say any of that even after being told by Mr. Reynolds, you know, let's be straight with each other here, he said 6:00 in no uncertain terms and he said 7:00 these other two arrived. So, that phone call to get them there had to be placed after 6:00. Now, did something happen between February 22, 2012 and August 1st of 2012, when he signed his agreement [to testify]? Did something pop up? This text message that Detective

- 15 -

Jackson found on Marcus Cogmon's phone, "Might rob him after we're done." This is beautiful. This is good stuff. This is evidence of a conspiracy. This is evidence that Marcus Cogmon at least went to the house with the idea that maybe they're going to rob these guys. This is great. This is the mother [lode]. I'm sure [the prosecutor is] going to do a much better job of arguing that view [than] I ever could, but you know what? It's worthless as long as they didn't even get the call to go to the house until after that thing was sent. It's worthless. All the work that went into pulling that getting the phone out of the car and putting it in the bag and putting it in the airplane mode and pulling the battery out and getting the warrant to search it and having, you know, the Detective Walsh go through it and having, you know, Detective Jackson have to open it up, all of that is for nothing as long as they never got the call until after that was sent. So, he made an agreement and are you surprised that it's kind of steering towards this? This is sworn testimony, ladies and gentlemen. This preliminary hearing transcript is sworn testimony and Judge Kelly's going to tell you that you can consider this as evidence of what happened. Not just bearing on credibility, but actually evidence of what happened. Where he says, "So, what time did you get the phone call to go over to Jalil Howard's baby's mom's house? Around 6:00." That's on page 43. On page 44 he says, "So, around 7:00 these guys arrived?" Answer, "Yeah, around 7:00." That's evidence of what happened and this is February. This is two months after the incident. But we can't, you know, we got to do something about that, because it doesn't make any sense. We got to have that–that's got to change. Tania Campbell says, well, I got home at 4:00 and they were there, but I asked, you know, Tania Campbell if she spoke to the police that night. She said, yeah, I spoke with them. I said, did they ask you what time you got home? Yeah, they asked me. So, I took her to task a little bit. I asked her to look at the recording of her statement, to find in the statement where the police asked her what time she got home. She thumbed through it for a couple minutes and finally said, no, they didn't ask me that. So, the first time she's asked what time she got home that night, this past Friday by the District Attorney. You can't trust her. You can't accept it.

(N.T. Trial, 5/2/13, at 108-11). Counsel for Mr. Cogmon stated the following

during his closing argument:

> Now, the text message. The text message is very important in the Commonwealth's case because the timing of it. They can't change the time on that text message. I believe it's 5:46. 5:49 p.m. They can't change that. … [Mr. Washington] says that they didn't even get there, meaning him [sic] and [the victim,] until about 7:00. That's at the preliminary hearing. Since the preliminary hearing and today, well, Friday, what has happened? Well, what's happened is he's found out about this text message. They didn't get that until last August. … Many witnesses have motives to lie, they may not even consider it a lie. They may just consider it, I'm doing the right thing, I'm helping out. So, when you have a person who puts his hand on the Bible on two separate occasions and on one occasion, which is only, I don't know, two months after the incident says he got there at 7:00 p.m., then the phone call is made to these guys to come to the party and that these guys then arrive at 8:00, that's his preliminary hearing notes, that's his statement there, then how can a phone call, a text message from hours earlier be related to this? You'll have to reconcile that for yourselves, ladies and gentlemen, but I suggest to you…that it's wholly unrelated to this incident.

*Id.* at 119-22. The prosecutor subsequently made the following remarks

during his closing argument:

> When timing becomes important, yeah, I go back and look for other evidence, that's why I had Mr. Washington testify where did you go before you got to [the victim's residence] to pick him up and how long did you spend, maybe a half-hour at his house before you go over to Upland? I went to the liquor store. What's going to be correct on the time? A receipt from a store that says 2:35? Yeah. So, when you know the store can say yeah, you were here and you bought this on this day at this time. So, in case you come back and make a return it's too late. The time and date has passed. So, let me ask you this, if the timing[']s so wrong and that text message doesn't match up, the

- 17 -

natural inference from defense counsel's argument is who the hell were they going to rob?

*Id.* at 143-44. Mr. Cogmon's counsel immediately objected to the statement, "who the hell were they going to rob?" Following a sidebar, Mr. Cogmon's counsel moved for a mistrial and counsel for Appellant joined the motion. The court denied the motion and both defense attorneys declined the court's offer of a curative instruction. The court reasoned as follows in its Rule 1925(a) opinion:

> On reviewing the appellate complaint in the context of the trial as a whole, the Assistant District Attorney was within the bounds assigned by him in his prosecutorial duties to "argue the evidence" and present inferences based upon the evidence that had been presented at trial. The Commonwealth's attorney simply rebutted those direct evidentiary inferences and relevant portions of the closing arguments that the defense attorneys had vigorously employed to place in doubt with the jury throughout both the course of the witness testimony and their respective summations.
>
> The two (2) defense attorneys unquestionably attempted to call into question the time frames of the events that transpired on December 13, 2011. Related to the time sequence of the witness[es]', victim's, and [Appellant's and Mr. Cogmon's] respective arrivals centered around the incriminating text message's seemingly undisputed time, both defense counsel further attempted to have the jury doubt the credibility of the Commonwealth's witness, Mr. Washington, through the review of the Preliminary Hearing testimony and by having also Detective Jackson questioned concerning statements made by Mr. Washington at the preliminary hearing. The two (2) defense attorneys fixated on the arrival times of the individuals at Mr. Howard's residence to the extent that it led the Assistant District Attorney to question this focus, and fairly suggest in direct response that if the times were wrong, and if Mr. Washington was incorrect in his memory

of when he, [the victim], and [Appellant and Mr. Cogmon] arrived at the home, then it is questionable as to what would cause such a text message to be sent, as well as to whom the text message could be referencing.

The prosecutor had the ability to respond to both the evidence brought forth at trial and to the related arguments presented by the defense attorneys during their closing summations. During both the defense counsels' closing arguments, each attorney separately questioned the timing of the arrival of [the victim], Mr. Washington, and [Appellant and Mr. Cogmon]. Through these statements, they attempted to cast both Ms. Campbell's and Mr. Washington's credibility into doubt and equally, if not more importantly, [Appellant and Mr. Cogmon] sought to distance themselves from their patently incriminatory text message and its otherwise clear nexus to [the victim's] subsequent robbery and murder.

\* \* \*

Reviewing all the testimonial evidence and the closing argument of the Assistant District Attorney, this challenged comment was not some devious attempt to interject "implied unrelated criminal behavior on the part of [Appellant]," but rather one sentence clearly framed as a direct response to respective arguments both defense lawyers unquestionably vigorously advanced…during their respective closings stemming from trial evidence each of [Appellant's and Mr. Cogmon's] attorneys were particularly scrutinizing. There was support in the record throughout trial established by the prosecution and defense that there was a concern surrounding the timing of not only [Appellant and Mr. Cogmon's] arrival, but also the Commonwealth's witnesses' arrival at Mr. Howard's residence. Related to this evidence, the connection and ability of the Assistant District Attorney to properly reference the timing of the text message stating, "might rob him when we done," is without question. Defense counsel focused on the time of the text message, plainly arguing that the time of the incriminatory communication would not have correctly aligned to the victim's subsequent robbery and murder had Mr. Washington erroneously relayed when he and [the victim] arrived at

Mr. Howard's residence. The Commonwealth's attorney was thus free to elaborate on this matter as he saw necessary to "argue that the evidence leads to the conclusion of guilt, and [was] permitted to suggest all favorable and reasonable inferences that arise from the evidence." [**Commonwealth v. Chamberlain**, 612 Pa. 107, 153, 30 A.3d 381, 408 (2011), *cert. denied*, ___ U.S. ___, 132 S.Ct. 2377, 182 L.Ed.2d 1017.]

\* \* \*

[] The court did not find that the prosecutor's single sentence statement extended to the reaches of prejudicial impact that the defense lawyers believed and offered to correct the statement heard by the jury regardless of this court not finding a sufficient amount of prejudice in the Commonwealth's remark so as to warrant a mistrial.

\* \* \*

When properly viewed in the context of the case record as a whole, that exceptionally modest portion of the Assistant District Attorney's closing argument complained about on appeal was permissible advocacy. …

(Trial Court Opinion, filed June 23, 2014, at 50-55) (internal citations to the record omitted). The record supports the court's analysis. The prosecutor's challenged remark referenced evidence of record and was a reasonable response to Appellant and Mr. Cogmon's persistent argument that the text message was unrelated to the robbery/homicide of the victim that occurred just hours after the message was sent. **See Chmiel, supra**; **Harris, supra**. The trial court acted well within its discretion when it determined the remark was not so prejudicial as to deprive Appellant of a fair trial. **See Correa, supra**; **Davis, supra**. Therefore, Appellant's second issue merits no relief.

Nevertheless, we observe in the certified record that the court imposed

a mandatory minimum sentence for Appellant's conspiracy conviction, pursuant to 42 Pa.C.S.A. § 9712, because the conspiracy involved a robbery committed with a firearm. Although Appellant has not challenged this portion of his sentence, the legality of a sentence is a nonwaivable issue and we can review an illegal sentence *sua sponte*. *See Commonwealth v. Oree*, 911 A.2d 169, 172 (Pa.Super. 2006), *appeal denied*, 591 Pa. 699, 918 A.2d 744 (2007).

Section 9712(a) sets forth a mandatory minimum sentence of five (5) years' imprisonment where a defendant is convicted of a crime of violence if the defendant visibly possessed a firearm that placed the victim in reasonable fear of death or serious bodily injury during the commission of the offense. 42 Pa.C.S.A. § 9712(a). *See also id.* § 9714(g) (including within definition of "crime of violence" conspiracy to commit any crime of violence). Section 9712(b) states that the statutory provisions shall not be an element of the crime and applicability of the statute shall be determined at sentencing by a preponderance of the evidence. *Id.* § 9712(b). In *Alleyne v. United States*, ___ U.S. ___, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013), the United States Supreme Court expressly held that any fact increasing the mandatory minimum sentence for a crime is considered an element of the crime to be submitted to the fact-finder and found beyond a reasonable doubt. Recently, in *Commonwealth v. Newman*, 99 A.3d 86 (Pa.Super. 2014) (*en banc*), this Court addressed the constitutionality of a

similar statute, 42 Pa.C.S.A. § 9712.1, in light of **Alleyne**.[5]  Relying on

**Alleyne**, **Newman** held that Section 9712.1 can no longer pass

constitutional muster as it "permits the trial court, as opposed to the jury, to

increase a defendant's minimum sentence based upon a preponderance of

the evidence that the defendant was dealing drugs and possessed a firearm,

or that a firearm was in close proximity to the drugs."  **Newman, supra** at

98.   This Court vacated Newman's PWID sentence and remanded for

resentencing without imposition of the mandatory minimum under Section

9712.1.  **See also Commonwealth v. Valentine**, 101 A.3d 801 (Pa.Super.

2014) (extending logic of **Alleyne** and **Newman** to Sections 9712 and 9713

and holding those sections are likewise unconstitutional insofar as they

permit automatic increase of defendant's sentence based on preponderance

of evidence standard; statutes are not severable and are unconstitutional in

their entireties).  **Accord Commonwealth v. Hopkins**, ___ A.3d ___, 2015

WL 3949099 at *11-13 (Pa. June 15, 2015) (declaring mandatory minimum

statute at 18 Pa.C.S.A. § 6317 (drug-free school zones) unconstitutional in

its entirety under **Alleyne**, where that statute stated its provisions were not

elements of crime and applicability of statute should be determined at

_____

[5] This Court made clear that **Alleyne** is subject to limited retroactivity; in other words, **Alleyne** is applicable to all criminal cases still pending on direct review.  **Newman, supra** at 90.  Because Newman's case was still pending on direct appeal, the holding in **Alleyne** applied to Newman's case, as it also does here in this direct appeal.

sentencing by preponderance of evidence).

Instantly, a jury convicted Appellant of, *inter alia*, conspiracy with respect to three (3) charges of robbery. At sentencing, the court applied Section 9712 to one of Appellant's convictions for conspiracy to commit robbery (threatens another with or intentionally puts him in fear of immediate serious bodily injury) and merged the remaining conspiracy convictions. Given this Court's binding decisions in **Newman** and **Valentine**, however, we must vacate Appellant's mandatory minimum sentence for conspiracy and remand for resentencing solely on that conviction. Accordingly, we affirm Appellant's convictions, vacate Appellant's mandatory minimum sentence for conspiracy, and remand for resentencing solely on that count. We affirm the judgment of sentence in all other respects.

Judgment of sentence affirmed in part and vacated in part; case remanded for limited resentencing. Jurisdiction is relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/11/2015