**COMMONWEALTH of Pennsylvania,
Appellee**

v.

**Brandon CLEMENS, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 17, 2012.

Filed April 15, 2013.

374

Karl Baker, Public Defender, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: OLSON, WECHT and COLVILLE,* JJ.

OPINION BY OLSON, J.:

Appellant, Brandon Clemens, appeals from the judgment of sentence entered on November 23, 2011. We affirm.

■ On appeal, Appellant claims that the lower court erred when it denied his pre-trial motion to suppress. In reviewing such a challenge, this Court "must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole." *Commonwealth v. Eichinger*, 591 Pa. 1, 915 A.2d 1122, 1134 (2007) (internal citations omitted). Observed in this light, the relevant facts are as follows.

On the morning of June 27, 2009, City of Philadelphia Police Officer Ivan Centeno was on routine patrol and driving a marked police vehicle down the 800 block of South Cecil Street in Philadelphia. Officer Centeno's partner, Officer Clifford Gilliam, Jr., sat in the vehicle's passenger seat. N.T. Suppression Hearing, 4/27/11, at 6–7. As Officer Centeno testified, the 800 block of South Cecil Street is a residential area that is "very high" in crime and "very violent." *Id.* In fact, during the suppression hearing, Officer Centeno testified that he had patrolled the area for the prior five years and was personally aware of "numerous shootings [and] stabbings" in the area, as well as "nonstop" open-air narcotics sales. *Id.*

* Retired Senior Judge assigned to the Superior Court.

*Officer Centeno testified that, at approximately 11:00 a.m. on June 27, 2009, while driving down the 800 block of South Cecil Street:*

I observed [Appellant engage in] a hand-to-hand transaction with an unknown male. I [then] observed [Appellant] here turn his head in the direction of my police vehicle. [After looking directly at the marked police vehicle, Appellant] turn[ed] around, r[an] straight to [the residential house of] 831 [South Cecil Street,] up the steps onto the porch, [and] s[at] on a lawn chair.

*Id.* at 8. Appellant then "grabbed a newspaper and acted like he was reading the newspaper." N.T. Trial, 9/29/11, at 168.

Even though Officer Centeno did not observe money or objects pass between the two individuals, Officer Centeno testified that—based upon his training and years of experience—he was of the conviction that he had just witnessed a narcotics transaction. N.T. Suppression Hearing, 4/27/11, at 9. Therefore, Officer Centeno parked his vehicle and, accompanied by Officer Gilliam, the officers approached 831 South Cecil Street. Officer Centeno testified that Officer Gilliam accompanied him—and did not pursue the suspected purchaser of the narcotics—because Appellant "was more of a hazard for us" and because, if Appellant had "a weapon or something," the officers wanted to avoid a "one-on-one situation." N.T. Trial, 9/30/11, at 4–5.

According to Officer Centeno, when the officers approached the front steps of 831 South Cecil Street, Officer Centeno:

asked [Appellant] if he lived at that location. He stated no ... he did not live at that location. [Officer Centeno then] asked [Appellant] if he had any identifi-

cation on him, stating who he was. He said no. [Officer Centeno] said do you live on the block.... [Appellant] couldn't prove any identification whatsoever.

N.T. Trial, 9/29/11, at 165–166.

Officer Centeno testified that, at this point, he "asked [Appellant] to [stand up and] turn around ... [so that he could] pat [Appellant] down for officer safety ... for [Officer Centeno's own] safety and [for Officer Centeno's] partner's safety." N.T. Suppression Hearing, 4/27/11, at 9 and 16. As Officer Centeno testified, he believed that Appellant might be armed and dangerous—and that a frisk for officer safety was thus necessary—because of a variety of circumstances, including the fact that: Officer Centeno knew the area was high in violent crime and Officer Centeno was personally aware of "the violence that happens there, the shootings that happen there, all the drug sales, everything together;" Officer Centeno had just witnessed a hand-to-hand transaction that, as his years of experience and training had taught him, was most likely a felony narcotics transaction;[1] from Officer Centeno's experience, drug dealers were often armed and dangerous; after engaging in the hand-to-hand transaction, Appellant saw Officer Centeno's marked police vehicle and then immediately (and strangely) ran onto the porch of 831 South Cecil Street and pretended to read a newspaper; when asked, Appellant admitted that he did not live at 831 South Cecil Street—which is a residential house—and Appellant provided Officer Centeno with no explanation as to why he was sitting on someone else's residential property; Appellant provided Officer Centeno with no

---

1. At the suppression hearing, Officer Centeno testified that—over the prior five years—he had personally made "over 100 narcotics ar-
rests in ... about a four or five block radius" of 831 South Cecil Street. N.T. Suppression Hearing, 4/27/11, at 7.

identification and would not tell Officer Centeno where he lived; and, throughout the encounter with Officer Centeno, Appellant acted "nervous[ly]." N.T. Suppression Hearing, 4/27/11, at 5–9, 19, 20, and 22–23; N.T. Trial, 9/29/11, at 163–168; N.T. Trial, 9/30/11, at 4–5.

In response to Officer Centeno's demand, Appellant stood up and turned around for the frisk. N.T. Trial, 9/29/11, at 166–167. As Officer Centeno testified:

> As soon as [Appellant] spread his legs, a clear plastic sandwich bag with a knot, containing 31 heat-sealed Ziploc type packets with a black clover stamp design on them, fell from his pants. He had on like [ ] tan[,] khaki shorts. They came from his leg area, fell down to the ground on the porch. He then step[ped] on it with his foot [and tried] to hide it.
>
> . . .
>
> I immediately, as soon as I saw it, knew what it was. It was narcotics. It was bags of crack [cocaine] inside the sandwich bag. It had little stamps on it, each one. He tried to step on it with his foot, so I couldn't see it and I looked toward my partner to let him know, look, he just stepped on the narcotics. He has to be placed under arrest.

N.T. Suppression Hearing, 4/27/11, at 9; N.T. Trial, 9/29/11, at 166–167. Further, Officer Centeno testified that he saw the bag of narcotics fall from Appellant before he even laid a hand on Appellant's person. N.T. Suppression Hearing, 4/27/11, at 9; N.T. Trial, 9/29/11, at 169–170.

Later testing revealed that the heat-sealed packets contained a total of 2.213 grams crack cocaine. N.T. Trial, 9/30/11, at 33. Moreover, following Appellant's arrest, Officer Centeno searched Appellant incident to the arrest. This search revealed that Appellant possessed $328.00 in "balled up" dollar bills. N.T. Trial, 9/29/11, at 172. The bills were in "all different quantities and [Appellant had] different amounts in each [of the four] pocket[s on his khaki shorts]." Id.; N.T. Trial, 9/30/11, at 29.

The Commonwealth charged Appellant with possession of a controlled substance and possession of a controlled substance with the intent to deliver ("PWID").[2] Prior to trial, Appellant filed a motion to suppress all physical evidence against him. Within this motion, Appellant first claimed that the police did not have reasonable suspicion to subject him to an investigatory detention. Appellant also claimed that, even if the initial stop was proper, the police did not have justification to frisk Appellant, as they did not have any reason to believe that Appellant was armed and dangerous. Appellant's Suppression Motion, 11/20/09, at 1; N.T. Suppression Hearing, 4/27/11, at 3–4.

Following a suppression hearing, the suppression court denied Appellant's motion. First, the suppression court concluded that, based upon Officer Centeno's observations and experience, Officer Centeno had reasonable suspicion to subject Appellant to an investigatory detention, as Officer Centeno had reasonable suspicion to believe that Appellant had just engaged in a felony drug transaction. Id. at 38. Second, the suppression court concluded that the totality of the circumstances supported Officer Centeno's suspicion that Appellant might have possessed a weapon. Id. at 39. Therefore, since the suppression court concluded that both the detention and the "frisk" were justified, the suppression court denied Appellant's motion. Id.

Appellant proceeded to trial, where the jury found him guilty of possession of a controlled substance and PWID. On No-

---

**2.** 35 P.S. § 780–113(a)(16) and (30), respectively.

vember 23, 2011, the trial court sentenced Appellant to a term of three to six years in prison for PWID and, on December 13, 2011, Appellant filed a timely notice of appeal to this Court. Now on appeal, Appellant raises the following claim: [3]

> Did not the [suppression] court err in denying [A]ppellant's motion to suppress physical evidence under both the [United States and Pennsylvania c]onstitutions[,] where [A]ppellant was seized absent reasonable suspicion or probable cause when the observing officer saw [A]ppellant and another individual with their arms outstretched, but did not witness any transaction, and then followed [A]ppellant onto a porch and ordered him to stand up to be frisked?

Appellant's Brief at 3.

■ Our Supreme Court has declared:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Eichinger*, 915 A.2d at 1134 (internal citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa.Super.2006). Moreover, with respect to our scope of review on suppression issues, our Supreme Court has held: "it is appropriate to consider *all* of the testimony, not just the testimony presented at the suppression hearing, in determining whether evidence was properly admitted." *Commonwealth v. Chacko*, 500 Pa. 571, 459 A.2d 311, 318 n. 5 (1983) (emphasis in original); *see also Commonwealth v. Charleston*, 16 A.3d 505, 516–518 (Pa.Super.2011) (collecting cases and explaining *Chacko*).

■ First, Appellant claims that the suppression court erred in concluding that Officer Centeno had reasonable suspicion to subject Appellant to an investigatory detention. This claim fails.

■ As we have explained, "[t]he Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures. To safeguard this right, courts require police to articulate the basis for their interaction with citizens in [three] increasingly intrusive situations." *Commonwealth v. McAdoo*, 46 A.3d 781, 784 (Pa.Super.2012). Our Supreme Court has categorized these three situations as follows:

> The first category, a mere encounter or request for information, does not need to be supported by any level of suspicion, and does not carry any official compulsion to stop or respond. The second category, an investigative detention, derives from *Terry v. Ohio*[4] and its progeny: such a detention is lawful if sup-

---

**3.** The trial court ordered Appellant to file a concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). Appellant com- plied and preserved the claims he currently raises on appeal.

**4.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

ported by reasonable suspicion because, although it subjects a suspect to a stop and a period of detention, it does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The final category, the arrest or custodial detention, must be supported by probable cause.

*Commonwealth v. Smith,* 575 Pa. 203, 836 A.2d 5, 10 (2003).

■ We agree with Appellant that—when Officer Centeno told Appellant to stand up and turn around so that the officer could pat Appellant down for officer safety—Officer Centeno subjected Appellant to an investigatory detention. *See* Appellant's Brief at 8–11; *see also Commonwealth v. Hicks,* 434 Pa. 153, 253 A.2d 276, 279 (1969) ("*Terry* makes it clear that if a police officer accosts a person on the street and restrains him of his freedom to walk away, [the officer] has 'seized' that person"). As noted above, an investigative detention is valid when it is supported by reasonable suspicion. In the words of the Pennsylvania Supreme Court:

Reasonable suspicion is a less stringent standard than probable cause necessary to effectuate a warrantless arrest, and depends on the information possessed by police and its degree of reliability in the totality of the circumstances. In order to justify the seizure, a police officer must be able to point to specific and articulable facts leading him to suspect criminal activity is afoot. In assessing the totality of the circumstances, courts must also afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and acknowledge that innocent facts, when considered collectively, may permit the investigative detention.

. . .

■ The determination of whether an officer had reasonable suspicion that

criminality was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances. It is the duty of the suppression court to independently evaluate whether, under the particular facts of a case, an objectively reasonable police officer would have reasonably suspected criminal activity was afoot.

*Commonwealth v. Holmes,* 609 Pa. 1, 14 A.3d 89, 95 and 96 (2011) (internal citations, quotations, and emphasis omitted).

According to Appellant, when Officer Centeno subjected him to the investigative detention, the officer did not have reasonable suspicion to believe that Appellant had just sold narcotics. Appellant's Brief at 8. With respect to the "hand-to-hand transaction" that Officer Centeno observed between Appellant and the unidentified man, Appellant notes that Officer Centeno did not see any objects being exchanged and did not hear the accompanying conversation. *Id.* at 10–11. As a result of this lack of evidence, Appellant claims that, in reality, "Officer Centeno saw nothing more than two men greet each other with a handshake or a fistbump[, which is an action that is] completely consistent with innocent behavior." *Id.* at 11.

■ Clearly, Appellant's argument is contingent upon this Court viewing the evidence in the light most favorable to him. As was explained above, however, our standard of review requires that we "consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole." *Eichinger,* 915 A.2d at 1134. Moreover, "[w]here the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Id.*

In the case at bar, the record clearly supports the suppression court's conclusion that, at the time of the investigative detention, Officer Centeno possessed reasonable suspicion to believe that Appellant had just sold narcotics. First, although Officer Centeno testified that he did not see the particular objects that were being passed between Appellant and the unidentified man, Officer Centeno plainly testified that, based upon his experience and training, he witnessed Appellant engage in a hand-to-hand narcotics transaction with the other individual. *See, e.g.,* N.T. Suppression Hearing, 4/27/11, at 7–9. Thus, Appellant is factually incorrect to claim that "Officer Centeno saw nothing more than two men greet each other with a handshake or a fistbump." Appellant's Brief at 11.

Further, viewing the totality of the circumstances surrounding the hand-to-hand transaction, we agree with the suppression court that "an objectively reasonable police officer would have reasonably suspected criminal activity was afoot." *Holmes,* 14 A.3d at 96. Indeed, during the suppression hearing, Officer Centeno testified that he was extremely familiar with the 800 block of South Cecil Street and was extremely experienced in narcotics investigations. N.T. Suppression Hearing, 4/27/11, at 5–6 and 7. According to Officer Centeno, his years of experience and training had taught him that the hand-to-hand transaction he witnessed was most likely a narcotics transaction. *Id.* at 9; *see also Holmes,* 14 A.3d at 95 ("In assessing the totality of the circumstances, courts must [ ] afford

due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience"). Officer Centeno also testified that the surrounding area was home to "nonstop" open-air narcotics sales. N.T. Suppression Hearing, 4/27/11, at 6–7; *see also Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (holding "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis").[5] Moreover, Officer Centeno testified that, after Appellant completed the transaction, Appellant looked directly at Officer Centeno's marked police vehicle and then suspiciously ran onto the porch of 831 South Cecil Street and pretended to read a newspaper. N.T. Suppression Hearing, 4/27/11, at 8–9 and 19; N.T. Trial, 9/29/11, at 168; *see also Wardlow,* 528 U.S. at 124, 120 S.Ct. at 676 (holding that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). Finally, when asked, Appellant admitted that he did not live at 831 South Cecil Street—and Appellant provided Officer Centeno with no explanation as to why he was sitting on someone else's porch or where he actually lived. N.T. Trial, 9/29/11, at 165–166.

Given these "specific and articulable facts," we agree that "an objectively reasonable police officer would have reasonably suspected" that Appellant had sold narcotics to the unidentified man. *Holmes,* 14 A.3d at 95 and 96. As such, we agree that the investigatory detention was properly supported by reasonable sus-

5. As the Pennsylvania Supreme Court has explained:

> Pennsylvania courts have consistently followed *Terry* in stop and frisk cases, including those in which the appellants allege protections pursuant to Article 1, Section 8 of the Pennsylvania Constitution. In these circumstances, for decisional purposes we will assume that the approach under [the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution] is coterminous. *Commonwealth v. Revere,* 585 Pa. 262, 888 A.2d 694, 699 n. 6 (2005) (internal quotations omitted).

picion. Appellant's claim to the contrary fails.

▉▉▉▉ For the second and final aspect of Appellant's claim on appeal, Appellant contends that Officer Centeno was not justified in subjecting him to a frisk, as Officer Centeno did not have sufficient reason to believe that he was armed and dangerous. Thus, Appellant asserts that the frisk was unconstitutional. Appellant's Brief at 14. We conclude, however, that Officer Centeno did not subject Appellant to a frisk in this case. Therefore, Appellant's claim automatically fails.[6]

We observe that—in this case—the issue of when the "frisk" began is a pure question of law. *See, e.g., Commonwealth v. Collins*, 950 A.2d 1041, 1046 (Pa.Super.2008) (*en banc*) (determination of whether a police/citizen interaction was a "mere encounter" or an "investigative detention" is a question of law); *see also Crawford Cent. Sch. Dist. v. Commonwealth*, 585 Pa. 131, 888 A.2d 616, 620 (2005) ("[s]ince the facts are undisputed, we are left with a question of law"). Therefore, with respect to this issue, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Bullock*, 590 Pa. 480, 913 A.2d 207, 212 (2006).

As our Supreme Court has explained:

It is well-established that a police officer may conduct a brief investigatory stop of an individual if the officer observes unusual conduct which leads him to reasonably conclude that criminal activity may be afoot. Moreover, if the officer has a reasonable suspicion, based on specific and articulable facts, that the detained individual may be armed and dangerous, the officer may then conduct a frisk of

the individual's outer garments for weapons. Since the sole justification for a *Terry* search is the protection of the officer or others nearby, such a protective search must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby. Thus, the purpose of this limited search is not to discover evidence, but to allow the officer to pursue his investigation without fear of violence.

*Commonwealth v. Stevenson*, 560 Pa. 345, 744 A.2d 1261, 1264–1265 (2000) (internal citations and quotations omitted).

Here, Appellant assumes that a *Terry* frisk commenced when Officer Centeno ordered him to stand up and turn around in preparation for the frisk. Indeed, for Appellant to contest this particular aspect of the interaction, Appellant must make this assumption, since (as was explained above) the bag of narcotics fell from Appellant's pants—and into Officer Centeno's plain view—before Officer Centeno placed a hand on Appellant's person. N.T. Suppression Hearing, 4/27/11, at 9; N.T. Trial, 9/29/11, at 169–170. Moreover, Officer Centeno testified that, as soon as he saw the bag of narcotics, he intended to (and then did) arrest Appellant. N.T. Trial, 9/29/11, at 166–167. Given these facts, at the time Officer Centeno first touched Appellant, Officer Centeno had both the probable cause and intent to arrest Appellant— and, thus, at the time Officer Centeno first touched Appellant, Officer Centeno was entitled to perform a valid search incident to Appellant's arrest. *Commonwealth v. Thompson*, 778 A.2d 1215, 1222 (Pa.Super.2001) ("search incident to arrest must be substantially contemporaneous with the

---

6. "This [C]ourt may affirm [the lower court] for any reason, including such reasons not considered by the lower court." *Common-* *wealth v. Truong*, 36 A.3d 592, 593 n. 2 (Pa.Super.2012) (*en banc* ).

arrest"); *Commonwealth v. Murray,* 441 Pa. 22, 271 A.2d 500, 501 (1970) (same).

Appellant's assumption—that the frisk commenced at the moment Officer Centeno ordered Appellant to stand up and turn around to prepare for the frisk—is, however, incorrect. Indeed, by its very definition, the term "frisk" requires tactile contact. *See* BLACK'S LAW DICTIONARY 692 (8th ed.2004) (defining a "frisk" as "[a] **pat-down search** to discover a concealed weapon.—Also termed *pat-down*.") (emphasis added) (italics in original); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 502 (11th ed.2003) (defining the noun "frisk" as "an act of frisking" and the transitive verb "frisk" as "to search (a person) for something (as a concealed weapon) by running the hand rapidly over the clothing and through the pockets"); *see also Terry,* 392 U.S. at 24–25, 88 S.Ct. 1868 (defining a frisk as an officer's "carefully limited search of the outer clothing of [an individual] in an attempt to discover weapons which might be used to assault [the officer];" further reasoning that an officer's justification for a *"Terry* frisk" must be greater than—or, at least, in addition to—that required for a *"Terry* stop" because a frisk is more intrusive than a detention).

Appellant's proposed interpretation of the term "frisk" would eliminate the requirement of "touch" and would allow a "frisk" to occur as a result of a verbal order. This interpretation is simply at odds with the plain meaning of the term "frisk," as well as with one of the United States Supreme Court's principal reasons for requiring additional safeguards prior to condoning a *Terry* frisk. *Terry,* 392 U.S. at 24–25, 88 S.Ct. 1868 ("[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security").

Instead, what occurred here is that Officer Centeno seized Appellant and then or-

dered Appellant to stand up and turn around so that the **anticipated** pat-down frisk could more safely and easily occur. *See* N.T. Trial, 9/29/11, at 166. Under such circumstances, Officer Centeno's direction to Appellant was simply a continuation of the lawful seizure and was consistent with our Supreme Court's precedent. Certainly, as our Supreme Court has held, "the need for safety or security in conducting and completing an investigative detention" enables an officer to move an individual "short distance[s]" during a detention. *Commonwealth v. Revere,* 585 Pa. 262, 888 A.2d 694, 707 (2005); *see also Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (the "question of whether the [officer's] order [for the driver] to get out of the car, issued after the driver was lawfully detained, was reasonable ... [is a question that is separate and apart] from the [legality of the officer's] later 'pat down' "). Since, for either federal or state constitutional purposes, Officer Centeno's verbal order for Appellant to "stand up and turn around" did not constitute a "frisk," Appellant's claim on appeal necessarily fails.

Judgment of sentence affirmed.