J-S35011-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ANDREA G. PRINCE | |
| Appellant | No. 1142 EDA 2014 |

Appeal from the Judgment of Sentence February 7, 2014
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0001155-2012

BEFORE: MUNDY, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY MUNDY, J.:        **FILED SEPTEMBER 28, 2015**

Appellant, Andrea G. Prince, appeals from the February 7, 2014 aggregate judgment of sentence of ten to twenty years' imprisonment, followed by ten years' probation, imposed following her convictions for third-degree murder, possession of an instrument of crime (PIC), and tampering with evidence.[1]  After careful review, we affirm.

The trial court summarized the relevant factual history of this case as follows.

> On November 23, 2011, officers from the City of Chester Police Department responded to 1300

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(c), 907, and 4910, respectively.

Crosby Square, apartment 18A in the city of Chester following a call for a domestic [incident] with a weapon. Officers were advised that a female would meet them outside of the apartment. Following their arrival at the residence, the officers were unable to locate anyone outside. They entered the apartment. The front door of the apartment was open and the officers observed CDs scattered around the living room floor. As the officers proceeded through the apartment, they observed shell casings on the steps. The body of Justin Haywood was at the bottom of these steps. Justin Haywood was lying with his chest down and his head facing the wall. He was pronounced dead on the scene at 8:12 P.M.

Officer Michael Canfield encountered [Appellant] on the street approximately "two clusters" down from Apartment 18A. She identified herself as the individual who made the 911 call. She told him that her children's father, the victim, Justin Haywood, was in her apartment and that he was getting out of hand and had a firearm, so she had to take her children down the street to a neighbor's house. Officer Canfield then handed [Appellant] off to Officer David DeFrank for further questioning. [Appellant] told Officer DeFrank that she had gotten into an argument with her boyfriend, and that she ran out of the apartment screaming for help and that two young black males ran into the apartment, that she heard gunshots, and that they ran away. She stated that she never saw these men before.

[Appellant] agreed to go with the officers to the police station where she then spoke to Detectives [Todd] Nuttall and [David] Tyler. There, [Appellant] changed her story once more and told the detectives that she had been arguing with her boyfriend, the victim, Justin Haywood, and that it had become physical. She said that he had pinned her up against the wall and had a gun in his hand. She said that she was able to grab the gun and take it from him. She explained that she then shot him and he fell down the stairs.

- 2 -

Trial Court Opinion, 10/15/14, at 1-2, (citations and footnotes omitted).

Appellant was arrested on November 23, 2011, and charged by criminal complaint with the aforementioned offenses, as well as first-degree murder.[2]  Criminal Complaint, 11/24/11, at 1-4.  On April 30, 2013, Appellant proceeded to a jury trial on said charges.  On May 3, 2013, the jury found Appellant guilty of tampering with evidence and not guilty of first-degree murder.  The jury was unable to reach a unanimous verdict with respect to third-degree murder and PIC .  Therefore, the trial court  ordered a mistrial relative to those two counts.

The Commonwealth sought a retrial on those counts, which commenced on November 15, 2013.  At the conclusion of the trial, on November 22, 2013, the jury found Appellant guilty of third-degree murder and PIC.  The trial court imposed an aggregate judgment of sentence of ten to twenty years' imprisonment on February 7, 2014.  On February 18, 2014, Appellant filed a post-sentence motion.  The trial court held a hearing, and on March 6, 2014, the trial court denied said motion.  On April 4, 2014, Appellant filed her timely notice of appeal.[3]

Appellant raises the following issues for this Court's consideration.

---

[2] 18 Pa.C.S.A. § 2502(a).

[3] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

- 3 -

> I[.]   Whether the [trial] court erred in denying the written request of [Appellant] to charge the jury regarding the flight and concealment of an individual named Robert Knight which tended to show his consciousness of guilt where the theory of the case put forth by [Appellant] was that the victim was shot and killed by Robert Knight[?]
>
> II[.] Whether the court erred in denying the written request of the defense to charge the jury on the manner in which they were to weigh the equal inferences that arose from the results of the gunshot residue testing admitted at trial[?]

Appellant's Brief at 7.

Both of Appellant's claims of error concern the trial court's refusal to instruct the jury as requested.  In evaluating such claims we note, "[o]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a [trial] court's decision only when it abused its discretion or committed an error of law." ***Commonwealth v. Baker***, 24 A.3d 1006, 1022 (Pa. Super. 2011) (citation omitted), *affirmed*, 78 A.3d 1044 (Pa. 2013).  We are required to "consider the charge as a whole to determine if the charge was inadequate, erroneous, or prejudicial. The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." ***Commonwealth v. Estepp***, 17 A.3d 939, 946 (Pa. Super. 2011) (citation omitted), *appeal dismissed*, 54 A.3d 22 (Pa. 2012).  Moreover, when a trial court refuses to deliver a specific jury instruction, "it is the function of this Court to

determine whether the record supports the trial court's decision."

***Commonwealth v. Buterbaugh***, 91 A.3d 1247, 1257 (Pa. Super. 2014)

(*en banc*) (citation omitted), *appeal denied*, 104 A.3d 1 (Pa. 2014).

In Appellant's first issue, she argues the trial court abused its discretion when it declined to deliver an adapted version of Pennsylvania Standard Criminal Jury Instruction 3.14, which concerns the correlation between flight and consciousness of guilt. Appellant's Brief at 14-16. The standard instruction reads, in relevant part, as follows.

> 1. There was evidence, including the testimony of [name of witness], that tended to show that the defendant [fled from the police] [hid from the police] [give specifics]. [The defendant maintains that [he] [she] did so because [reason].] The credibility, weight, and effect of this evidence is for you to decide.
>
> Generally speaking, when a crime has been committed and a person thinks he or she may be accused of committing it and he or she flees or conceals himself or herself, such flight or concealment is a circumstance tending to prove the person is conscious of guilt. Such flight or concealment does not necessarily show consciousness of guilt in every case. A person may flee or hide for some other motive and may do so even though innocent. Whether the evidence of flight or concealment in this case should be looked at as tending to prove guilt depends upon the facts and circumstances of this case and especially upon motives that may have prompted flight or concealment.
>
> …

Pa.S.S.J.I (Crim.) 3.14.  A flight instruction is properly given in the following circumstance.

> [A] person has reason to know he is wanted in connection with a crime, and proceeds to flee or conceal himself from the law enforcement authorities, such evasive conduct is evidence of guilt and may from a basis, in connection with other proof, from which guilt may be inferred.

*Commonwealth v. Tha*, 64 A.3d 704, 714 (Pa. Super. 2013) (citation omitted).

Prior to charging the jury, Appellant filed a written request to instruct the jury in accordance with Pennsylvania Suggested Standard Criminal Jury Instruction 3.14.  Appellant's Brief at 14.  However, instead of using Appellant's name in the instruction, she requested the trial court instruct on evidence of her boyfriend, Robert Knight's flight from the crime scene that evening.  *Id.*

At trial, there was no testimony in the Commonwealth's case-in-chief regarding Knight's presence in or departure from Appellant's home on November 23, 2011.  *See generally* N.T., 11/19/13-11/21/13.  After the Commonwealth rested its case, Appellant testified in her own defense.  N.T., 11/21/13, at 71.  We summarize the testimony relevant to this claim of error in the following manner.  Appellant and Haywood were in a romantic relationship that lasted for seven years, and the couple had two children

together.[4]  *Id.* at 72-73.  Between approximately 5:00 and 5:15 p.m. on the day of the homicide, Appellant was at her home with her children, a friend of her daughter's, and her own friend, Marie Slaughter, when Haywood arrived. *Id.* at 80.  Haywood inquired about Thanksgiving plans and asked Appellant if they could reconcile, which Appellant answered in the negative.  *Id.* at 81. Appellant then left to run errands, leaving Haywood in her home in charge of their two young sons.  *Id.*  Appellant returned approximately one and one-half hours later.  *Id*. at 82.   Shortly thereafter, at approximately 7:00 p.m., Appellant's boyfriend, Robert Knight, came over.  *Id.* at 84-86.  Appellant and Haywood began arguing because he did not want Knight around his children.  *Id.* at 87.  The argument upset Appellant's daughter's friend, and she ran from the house.  *Id.* at 88-89.  In response, Appellant walked her daughter and said friend to the friend's home.  *Id.* at 89-90.   When Appellant returned, she observed, from outside the apartment, that Haywood and Knight began fighting.  *Id.* at 90.  She remained outside and lost sight of the fight before she heard gunshots.  *Id.* at 90-91.  She went back into her residence to retrieve her two sons, and Knight came out and ran.  *Id.* at 91-92.   She testified that she previously gave statements implicating herself in the shooting to protect Knight.  *Id.* at 97, 143.

---

[4] Appellant has three children, a daughter and two sons. Haywood is the father of Appellant's two sons.

Appellant also presented the testimony of her oldest son, who was six-years-old at the time of Appellant's trial and four-years-old at the time of the homicide. *See id.* at 199. He testified, "Robert shot my dad …." *Id.* at 201. Slaughter also testified for the defense, relating that when she and Appellant returned from running errands that evening, Knight and Haywood began arguing. N.T., 11/22/13, at 8, 12. She further testified that she went to leave the apartment and, upon exiting, heard gunshots, after which Appellant came running up from the apartment. *Id.* at 12. Finally, Appellant presented the testimony of William Finkel, Knight's workplace manager. *Id.* at 30. Finkel testified that Knight began working at his place of employment in November of 2004. *Id.* at 36. He further testified that Knight last worked on November 23, 2011 and that thereafter, Knight "stopped showing." *Id.* Finkel clarified that Knight had not been terminated, that he had not given any notice of his intention to leave his job, and that no other employees, with whom Finkel spoke concerning Knight's absence, had heard from Knight. *Id.* at 36-38.

The trial court explained its decision to deny Appellant's request as follows.

> In the case *sub judice*, defense counsel proposed that the aforementioned instruction should have been given to support [the] defense that Robert Knight shot and killed Justin Haywood. This court did not believe it was proper to modify the standard charge 3.14 to instruct the jury that they could draw an inference of the guilt of Robert Knight based upon the fact that Robert Knight was missing.

> To have done so would not have been an accurate statement of the law.
>
> The instruction given, as a whole, clearly, adequately, and accurately presented the law to the jury for its consideration. The court respectfully submits that no abuse of discretion or error of law occurred.

Trial Court Opinion, 10/22/14, at 9 (footnote omitted); **_see also_** N.T.,11/22/13, at 59 (trial court ruling on Appellant's jury request and concluding "[the trial court doesn't] think it's appropriate to modify [the charge]"). Appellant argues that the trial court's rationale was based on a "mistaken impression" that the above charge is only available to the Commonwealth with respect to the flight of a defendant. Appellant's Brief at 14-16. The Commonwealth counters that there was no evidence that Knight was aware that he was being sought in the instant case; therefore, the trial court did not abuse its discretion in denying Appellant's request to instruct the jury on flight. Commonwealth Brief at 19. Alternatively, the Commonwealth argues that the trial court's failure to deliver the instruction amounted to harmless error. **_Id._** at 22.

For the following reasons, we disagree with the trial court's rationale underlying its decision to deny Appellant's request. In **_Commonwealth v. Milligan_**, 693 A.2d 1313 (Pa. Super. 1997) this Court opined on the appropriateness of adapting the aforesaid charge to reflect a non-defendant's flight in order to infer the guilt of that person. **_Milligan_**, **_supra_** at 1317-1318. We concluded, in light of, _inter alia_, the relevancy and

admissibility of evidence tending to show that the crime for which a defendant stands accused was committed by another, "once a defendant properly introduces evidence that someone else fled the crime scene, the trial court is duty bound to instruct the jury concerning the significance of this evidence." *Id.* at 1317. We also noted that Pa.S.S.J.I. 3.14 is largely "neutral in its application to a defendant or another party" and, for that reason, a "trial court could easily tailor this instruction to apply where the accused defends based on another party's flight." *Id.* at 1318. Therefore, we disagree with the trial court that it would be improper for a trial court to instruct on the relevance of another's flight. *See* Trial Court Opinion, 10/22/14, at 9.

In the instant case, Appellant offered testimony that Knight immediately fled from her residence following the fight ending in gunshots between himself and Haywood, her son testified that he witnessed Knight shoot Haywood, and Knight's manager testified that Knight was missing from work and no one knew of his whereabouts following the date of the incident. Accordingly, we conclude Appellant presented sufficient evidence that Knight was present at the crime scene and fled to warrant her requested instruction. *See Milligan*, *supra* at 1317.

Nevertheless, we agree with the Commonwealth that the trial court's error was harmless. "[U]nder the harmless error doctrine, the judgment of sentence will be affirmed in spite of the error only where the reviewing court

concludes beyond a reasonable doubt that the error did not contribute to the verdict." ***Commonwealth v. Moran***, 104 A.3d 1136, 1150 (Pa. 2014) (citation omitted).

Instantly, we observe that included in the trial court's instructions to the jury was the charge that the Commonwealth bore the burden of proof on each and every element of the offenses charged. N.T., 11/22/13, at 115-117. The trial court also instructed the jury on each element of each offense and what it must find in order to convict Appellant. ***Id.*** at 140-142, 145-150. "The omitted charge did not involve a fundamental matter such as the burden of proof." ***Milligan***, ***supra*** at 1318. Rather, it "merely would have suggested to the jury a manner in which to examine certain pieces of evidence." ***Id.*** Moreover, the crux of Appellant's defense was indeed that Knight was the person who committed the homicide. In ***Milligan***, we observed that "the **failure** to instruct on flight may result in the jury … treat[ing] the … flight as ironclad circumstances tending to prove consciousness of guilt." ***Id.*** (citation and quotation marks omitted, emphasis added). Therefore, rather than the omission prejudicing Appellant, it "may have worked to [her] advantage[,]" as the jury was free to infer Knight's supposed flight was "ironclad" circumstantial evidence of his

consciousness of guilt. **See id.** Accordingly, we conclude Appellant is not entitled to relief on this claim.[5]

Next, Appellant argues the trial court erred when it refused to instruct the jury that there were two equal inferences to be drawn from the evidence admitted at trial of gunshot residue on Appellant's hands. Appellant's Brief at 20. The Commonwealth responds that Appellant did not present evidence that would explain the existence of the residue; therefore, the trial court properly denied Appellant's request to instruct the jury on the equal inferences deriving from the evidence. Commonwealth Brief at 29.

Our Supreme Court has explained the appropriateness of such an instruction as follows. "When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or liberty." **Commonwealth v. Montalvo**, 986 A.2d 84, 99 (Pa. 2009) (citation omitted), *cert. denied*, **Montalvo v. Pennsylvania**, 562 U.S. 857 (2010).

---

[5] While we disagree with the rationale provided by the trial court, we observe, "[t]his [C]ourt may affirm [the lower court] for any reason, including such reasons not considered by the lower court." **Commonwealth v. Clemens**, 66 A.3d 373, 381 n.6 (Pa. Super. 2013) (citation omitted).

At trial, the Commonwealth offered the expert testimony of Susan Atwood of the Pennsylvania State Police Crime Laboratory in Harrisburg, Pennsylvania. N.T., 11/20/13, at 27. Atwood performed an analysis on samples that were taken from Appellant's hands on November 23, 2011. *Id.* at 33. She explained that samples were taken from Appellant's right and left palms and the back of Appellant's right and left hands. *Id.* at 38. Atwood concluded that there were particles "characteristic" of gunshot residue on Appellant's left palm but no particles "characteristic" of gunshot residue on Appellant's right palm or on the backs of either of Appellant's hands. *Id.* at 39. Atwood explained that in order for particles to be "characteristic" of gunshot residue, three elements must be present in the subject particle: lead, barium, and antimony. *Id.* at 40. She further testified that on each sample taken from each part of Appellant's hands, particles "indicative" of gunshot residue were present. *Id.* Atwood explained the difference in the findings and their significance as follows.

[The Commonwealth]:

Q. Can you explain the difference between a characteristic particle and an indicative particle?

[Atwood]:

A. The characteristic particle is a particle with lead, barium, and antimony all together in a single particle. Indicative particles are composed of maybe two of those three or one of those three items, and those kind of particles could actually come from environmental sources other than from a weapon, firing a weapon.

- 13 -

     Q.    Does the fact that there were indicative particles found in conjunction with characteristic particles is that significant in any way?

     A.    Yes. It's been shown that there are possibly some commercial fireworks or maybe some old brake linings in older cars that may have compositions like a characteristic particle, but when you find those, if you find those, they're usually not the indicative particle along with it that indicate that they came from a weapon.

     Q.    So, in other words if you only found indicative particles, it could have been -- it could have come from another source?

     A.    That's correct.

     Q.    But when you find indicative particles in conjunction with characteristic particles, it makes it more likely that it comes from a firearm?

     A.    Yes.

     Q.    Could you read for us Conclusion #5?

     A.    The above results indicate the accused, [Appellant], may have recently handled or discharged a firearm. They may also indicate the accused was in very close proximity to a firearm when it was discharged.

*Id.* at 41-42. On cross-examination, Atwood agreed with Appellant's counsel that "it's possible" a person who walked into a room after gunshot residue was "created and deposited on the surface" could pick up the residue from something on the surface the individual picked up. *Id.* at 58.

The trial court explained its decision to deny Appellant's request for an equal inference instruction, as follows.

- 14 -

In the case *sub judice*, there was not an *equal* inference regarding the gunshot residue findings to warrant such an instruction. While, at trial Susan Atwood, the Commonwealth's expert, testified that positive gunshot residue does not mean that a person fired a gun, and defense counsel argued this point in his closing to the jury, there was also evidence presented at trial that showed [Appellant] gave several conflicting stories to the police following the death of Justin Haywood, one of which she implicated herself in the crime. [Appellant], however, in her testimony at trial said that she was *not* inside the apartment at the time of the shooting. As such [per her own testimony], she was not "in very close proximity" to the gun when it was discharged.

[T]he evidence did not result in two equally reasonable and mutually inconsistent theories that would warrant the requested charge. The defense argued that [Appellant] picked up the "characteristic" and "indicative" particles on her hands when she went into the apartment *after* the shooting. The Commonwealth's expert testified that although "indicative" gunshot particles can sometimes come from "environmental sources" other than from the firing of a weapon, but when found in along with "characteristic" gunshot particles, as it was in the instant case, it is *more likely* derived from a firearm. Specifically, at trial, when asked by the Commonwealth if it was *more likely* that the particles recovered from [Appellant's] hands had come from a firearm, Dr. Atwood testified yes. As such, there were not "two equally reasonable and mutually inconsistent inferences" and the jury was not left to guess which inference to adopt. The presence of both "characteristic" and "indicative" particles on [Appellant's] hands made it *more likely* that they got there because of the discharge of a firearm and not by accident.

Accordingly, the requested charge was not appropriate under the circumstances of this case.

- 15 -

Trial Court Opinion, 10/22/14, at 11-12. (citations omitted, italics in original).

Instantly, we conclude the record supports the trial court's decision. *See Buterbaugh*, *supra*. While the expert opined there was a possibility that the residue could have been present because of Appellant touching something after the shots were fired, her expert conclusion indicated that [Appellant] "recently handled or discharged a firearm" or "was in very close proximity to a firearm when it was discharged." N.T., 11/20/13, at 42, 58. Appellant's own testimony at trial was that she remained outside of her apartment while Knight and Haywood were fighting and only entered after she heard gunshots to retrieve her two sons. N.T., 11/21/13, at 90-92. She further could not recall touching anything in the apartment and testified, "I grabbed the kids and I ran out [of] the house." *Id.* at 126. As such, we agree, under the circumstances of this case that there were not "two **equally** reasonable and mutually inconsistent inferences" that could be drawn from the evidence at trial. *See Montalvo*, *supra*. Thus, we conclude the trial court did not abuse its discretion or commit an error of law in denying Appellant's request. *See Baker*, *supra*.

Based on the foregoing discussion, we conclude Appellant is not entitled to relief on her claims. Accordingly, we affirm the February 7, 2014 judgment of sentence.

Judgment of sentence affirmed.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 9/28/2015*