J-S32028-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                    :            PENNSYLVANIA
                                      :
                        v.                        :
                                      :
                                      :
KEISHA SHANTE MOORE          :
                                      :
               Appellant          :      No. 1609 MDA 2017

Appeal from the Judgment of Sentence September 20, 2017
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0005213-2013

BEFORE:    PANELLA, J., NICHOLS, J., and PLATT, J. [*]

MEMORANDUM BY NICHOLS, J.:           **FILED SEPTEMBER 26, 2018**

Appellant Keisha Shante Moore appeals from the judgment of sentence imposed after the trial court found her guilty of aggravated assault and endangering the welfare of a child[1] at a non-jury trial. Appellant claims that she was entitled to have her statement to police suppressed based on the totality of the circumstances, including her cognitive impairment and intellectual disability.[2] We affirm.

The trial court summarized the factual and procedural background of this appeal as follows:

> On July 24, 2013, at approximately 3:00 p.m. [Harrisburg Police Department] Det[ective] Paula Trovy responded to Harrisburg

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2702(a)(1) and 4304(a)(1), respectively.

[2] As discussed below, Appellant has an overall IQ of 63.

Hospital for a report of an 8 year old boy [(the child)] with burns on his hands. [Detective] Trovy made contact with Appellant, the child's mother, and she indicated she did not cause the injuries. She testified that Appellant said they were spider bites, but the hospital indicated they were severe burns and they needed to send him via Life Flight to the burn center. While at the hospital, Appellant signed a consent to search her home to investigate what had happened. [Detective] Trovy described Appellant as understanding the forms and signed willingly. She is sure she explained the form to [Appellant], but could not recall whether she specifically asked [Appellant] if she understood it or if she could read it.

[Detective] Trovy, [Detective] Iachini and [Sergeant] Woodring all went to her house to investigate. A CYS caseworker was also there. The detectives left the hospital before Appellant and arrived at her home before she did. There were several other people in the home at the time.

While at the home, Appellant was not handcuffed or in custody. She was cooperative. The detectives determined they wanted to speak to her more and asked if she would accompany them to the police department. She agreed and [at approximately 4:30 p.m.,] they drove her there, again, no handcuffs were used. They went to the large . . . conference room and gave [Appellant] her *Miranda*[3] warnings. [Detective] Trovy was unable to recall with one hundred percent certainty that she had been the one to read Appellant her *Miranda* rights, but she is one hundred percent certain that the rights were given to Appellant. Appellant indicated she understood them. No one else from the house was taken to the police station that day.

Throughout the process, Appellant's story of [the child]'s injuries changed. Initially she stuck with her story about spider bites, but the detectives told her it was clear he had not been bitten by spiders as he was air lifted to a burn center. Then she said she dropped a cup of tea on him, then at some point she indicated she held his hands under hot water. [Appellant eventually admitted to doing so to punish her son.]

After some time, Appellant agreed to let them record a statement [at approximately 7:00 p.m. Appellant's recorded statement lasted approximately six minutes]. [Detective] Trovy recalled that

_____

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Appellant appeared to understand the questions and was cooperative. [The questioning of Appellant lasted approximately two hours. Appellant was released and returned home.]

Trial Ct. Op., 11/30/17, at 1-2 (record citations omitted). On September 6, 2013, Appellant was arrested and charged with aggravated assault and endangering the welfare of a child. At the time of her arrest, Appellant invoked her right to silence and requested an attorney.

On August 21, 2015, Appellant filed a motion to suppress. Appellant asserted that "in view of the totality of these circumstances, including [Appellant's] intellectual disability, her susceptibility to coercion and intimidation and her impaired understanding of her *Miranda* rights, her statement to the police on July 24, 2013 was not made voluntarily, knowingly and intelligently." Mot. to Suppress, 8/21/15, at 3-4 (unpaginated).

On December 2, 2015, the trial court convened a suppression hearing. The Commonwealth called Detective Trovy to testify regarding the circumstances of the interview with Appellant. Additionally, the Commonwealth called John S. O'Brien, II, M.D., as an expert in general and forensic psychiatry. Appellant called Neil H. Blumberg, M.D., as an expert in general and forensic psychiatry.

The trial court summarized the expert testimony presented at the suppression hearing as follows:

Dr. John O'Brien interviewed [Appellant] and reviewed her medical records and statement for the Commonwealth to determine whether she was able to knowingly, voluntarily and intelligently waive[] her *Miranda* warnings and provide a statement. He reviewed medical records of [the child] which indicated that

- 3 -

[Appellant] had brought him to the hospital twice in 2012 to get him help. First, for aggressive behavior towards other kids and second for threats to kill himself.

[Dr.] O'Brien testified that [Appellant] was a proactive parent. She was able to assert herself when it came to the care of or concerns about her child or employment.

He reviewed various materials regarding Appellant, including an evaluation from when she was 16 by a psychologist, a school evaluation from 2001 and an individual support plan from the Commonwealth of Pennsylvania Department of Public Welfare from March 2009. The reports he reviewed for Appellant were consistent with her having cognitive impairment and a diagnosis of intellectual disability.

Per [Dr.] O'Brien, Appellant's overall IQ is 63; however, her verbal IQ is 67 which is quite close to the cut off range from mild mental retardation. [Dr.] O'Brien explained that there are two types of impairments—intellectual and functional. He said she appears to be someone who primarily struggles with social impairment—she becomes angry if she thinks she is being teased or feels as if people look down on her. The various evaluations indicate to [Dr.] O'Brien that she is someone with an intellectual disability who functions independently and does not require support services. Her records indicate she has been employed but she terminated employment for a variety of reasons. Once because she thought she was underpaid and once because she though[t] people were making fun of her. He says this doesn't support Dr. Blumberg's assessment that she is easily influenced by others.

[Dr.] O'Brien also reviewed Dr. Blumberg's evaluation of Appellant. [Dr.] Blumberg and [Dr.] O'Brien agree on the intellectual disability-mild diagnosis, but disagree on whether she is easily influenced by others. Further, [Dr.] O'Brien indicates that she demonstrated an understanding of her rights to [Dr.] Blumberg, though not as articulately as some others might. Significantly, when she returned to the police station in September, she asserted her right to an attorney and her right to remain silent which indicates an understanding of her rights. [Dr.] O'Brien noted that her deficits remained the same but she chose to assert those rights during her second visit; if she wasn't able to knowingly, intelligently and voluntarily waive her rights the first time, one would expect her to remain unable to do so the second time.

[Dr. O'Brien] testified that she demonstrated a clear ability to comprehend questions and provide reasonable and responsive answers. He found nothing about her cognitive limitations that interfere with her ability to communicate, to understand what's being asked and to provide appropriate answers.

During his interview of her, she was able to provide responsive answers. During her recitation of the events leading up to her arrest, Appellant alleged that she caved to police pressure, but never alleged that she did not understand her rights. She says she was never told about her right to an attorney or any other rights but did ask "aren't they supposed to?" [Dr.] O'Brien found this interesting.

One of [the reports regarding Appellant] specifically notes that Appellant has lied in the past to stay out of trouble. Another report[] notes that she is highly independent and able to handle her own money.

The [Fifth Edition of the Diagnostic Statistical Manual (DSM-V)] indicates that individuals with her diagnosis generally need support to make legal decisions (amongst other things).

[Dr.] O'Brien did not specifically ask [Appellant] if she understood what each *Miranda* statement means. He did not have her explain to him the pros and cons of talking to the police. [Dr.] O'Brien felt that Dr. Blumberg had done a good job of questioning her regarding her rights and he relied on that. Based on the tests that [Dr.] O'Brien performed she has some short term memory problems and some problems with doing math. She didn't know the president's name, when asked about sports she said she liked basketball but then talked about football. She referenced movies when asked about favorite television shows.

Dr. Neil Blumberg testified on behalf of the defense. He administered a number of tests for cognitive impairment - the clock drawing, having her repeat numbers backwards to him, try to create a sentence with the words "dog" "moon" and "bark." She struggled with all of them. She had problems with short term memory. She did not know the capit[a]l of [Pennsylvania], she said there were 9 states in the US and that the distance from east to west coast was 110 miles. She wasn't able to demonstrate abstract thinking—that is, when given certain sayings "people in glass houses shouldn't throw stones" and "the grass is always greener on the other side", she was unable to explain what they

meant, other than literally. She can do basic addition but not subtraction, multiplication or division.

[Dr. Blumberg] tested for trauma related symptoms and discovered that [Appellant] did have ongoing trauma related symptoms. Appellant had been abused throughout her life, verbally, physically and sexually. Testing indicated that she is easily influenced by others and needs guidance from others. She has a family history of individuals with intellectual and academic limitations. Appellant has an elevated score on a test that measures an individual's tendency to look to others for guidance.

[Dr.] Blumberg testified that he did question her on *Miranda* rights. He gave her each warning and asked her what she thought it meant. For example, when asked what she thought the right to remain silent meant she said "what you did wrong." When asked what the word "right" meant she said, "You have to do it" and when asked "silent" meant she said "quiet." So then she said the right to remain silent meant "You gotta be quiet and don't say nothin'." [Dr. Blumberg testified:]

> When I asked her what "the right to have an attorney now" meant, she said, quote, "You don't have to talk unless you have a lawyer. A lawyer can help you understand your situation. Lawyers are for people who did something. I didn't do something. I wasn't thinking to stop and get a lawyer. It was like my grandmother was yelling at me."

[Appellant] did understand that she could get a free attorney to help with her case if she could not afford one.

[Dr.] Blumberg opined that she was susceptible or vulnerable to being influenced by others and was not able to waive her *Miranda* rights.

Trial Ct. Op. at 3-6.

The trial court deferred ruling on Appellant's suppression motion to permit the parties to submit memorandums. Following its review of the evidence and the memorandums, the court denied Appellant's motion to suppress on March 28, 2016.

Appellant proceeded to a non-jury trial held on August 1, 2017, at which Detective Trovy and a nurse from Harrisburg Hospital testified. Appellant did not testify or present evidence. The trial court found Appellant guilty.

On September 20, 2017, the trial court sentenced Appellant to time served with five years' intermediate punishment, and a consecutive five years' probation. Appellant did not file post-sentence motions, but timely appealed on October 12, 2017.

Appellant timely filed a Pa.R.A.P. 1925(b) statement challenging the trial court's suppression ruling. The trial court filed a responsive Pa.R.A.P. 1925(a) opinion. The court suggested that Appellant was not in custody at the time she gave her statement. In any event, the court concluded that Appellant waived her **Miranda** rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." **Id.** at 9-10.

Appellant presents the following question for our review:

> Did not the [trial] court err in failing to suppress statements that the police obtained from [Appellant] during custodial interrogation when the statements were not the product of a free, intelligent, knowing, voluntary, informed and explicit waiver by [Appellant] of her privilege against self-incrimination and her right to consult with counsel prior to interrogation?

Appellant's Brief at 5 (full capitalization omitted).

First, Appellant argues that the trial court erred in concluding she was not in custody. Appellant emphasizes that she was the focus of a criminal investigation, transported to the police station by two police officers, and

interrogated for two hours. Appellant's Brief at 27. Appellant claims she was not free to leave the interrogation. *Id.* Appellant further contends that the giving of *Miranda* warnings suggested that she was in custody. *Id.* at 27-28.

When reviewing a suppression ruling, our standard of review is as follows:

> [W]e determine whether the court's factual findings are supported by the record and whether the legal conclusions drawn from them are correct. Where, as here, it is the defendant who is appealing the ruling of the suppression court, we consider only the evidence of the prosecution and so much of the evidence for the defense which remains uncontradicted when fairly read in the context of the whole record. If, upon our review, we conclude that the record supports the factual findings of the suppression court, we are bound by those facts, and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Mitchell*, 902 A.2d 430, 450-51 (Pa. 2006) (citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Clemens*, 66 A.3d 373, 378 (Pa. Super. 2013) (citation omitted).

It is well settled that

> police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.

> The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for

the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring *Miranda* warnings.

Whether a person is in custody for *Miranda* purposes must be evaluated on case-by-case basis with due regard for the facts involved.

***Commonwealth v. Levanduski***, 907 A.2d 3, 24 (Pa. Super. 2006) (*en banc*) (citations omitted).

Following our review of the record, we agree with the trial court that the circumstances under which Appellant was asked to go to the police station, her transportation to the police station, and the conduct of the interrogation did not amount to a custodial detention. *See* Trial Ct. Op. at 8; *Levanduski*, 907 A.2d at 24. In any event, because the trial court considered the validity of Appellant's waiver of her *Miranda* rights, we will review that determination.

In support of her claim that the trial court erred in finding that Appellant waived her *Miranda* rights, Appellant argues that the reliability of the Commonwealth's expert, Dr. O'Brien, was undermined by numerous deficiencies. Appellant's Brief at 31. According to Appellant, Dr. O'Brien did not account for Appellant's traumatic experiences when suggesting that others did not easily influence Appellant. *Id.* at 31-32. Additionally, Appellant asserts that Dr. O'Brien also failed to consider that the DSM-V indicated that an individual with mild intellectual disabilities "generally needs support to make legal decisions." *Id.* at 32.

Appellant also challenges Dr. O'Brien's opinion that Appellant was capable of planning and decision-making. *Id.* Appellant suggests that Dr. O'Brien relied on a faulty factual assumption that, Appellant previously initiated mental health treatment for the child. *Id.* In that instance, Appellant notes, she was directed to seek mental health treatment by an agency caseworker. *Id.*

Appellant further emphasizes that Dr. O'Brien did not question Appellant on her ability to understand each component of the *Miranda* warnings. *Id.* at 32. Appellant asserts that such information was a "glaring deficiency" because there was no indication that the *Miranda* warnings were tailored to Appellant's cognitive impairments. *Id.* at 33. Therefore, Appellant concludes that the trial court abused its discretion when relying on Dr. O'Brien's opinion that Appellant knowingly, intelligently, and voluntarily waived her *Miranda* rights.

Appellant also argues that

[She] had a lower IQ and a lower level of adaptive functioning. Her IQ is 63. Her adaptive functioning is severely impaired. She has the communication and general coping skills of a 6-year-old. She has the daily living skills of an 11-year-old. She cannot read or write. She can add simple figures. She cannot subtract, multiply and divide. [she] has been receiving SSI benefits since childhood.

Only 1% of the population has an IQ under 65. Dr. Blumberg testified that a "very, very small percentage of the general population" has Ms. Moore's level of cognitive impairment and adaptive limitations.

*Id.* at 31. In light of these factors, Appellant asserts that ***Commonwealth v. Reynolds***, 446 A.2d 270 (Pa. Super. 1982), suggests error in the trial court's conclusion that Appellant was capable of knowingly, intelligently, and voluntarily waiving her ***Miranda*** rights.

> The principles governing our review are well established.
>
> The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review. Moreover, the totality of the circumstances must be considered in evaluating the voluntariness of a confession.
>
> The determination of whether a defendant has validly waived his ***Miranda*** rights depends upon a two-prong analysis: (1) whether the waiver was voluntary, in the sense that defendant's choice was not the end result of governmental pressure, and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice.

***Mitchell***, 902 A.2d at 450-51 (citations omitted).

A low IQ alone does not establish that a waiver of ***Miranda*** rights is involuntary, unknowing, or unintelligent. ***Commonwealth v. Chacko***, 459 A.2d 311, 317 (Pa. 1983), *abrogated on other grounds by **In re L.J.***, 79 A.3d 1073 (Pa. 2013).

> [I]n the suppression realm, the focus is upon police conduct and whether a knowing, intelligent, and voluntary waiver was effected based on a totality of the circumstances, which may include consideration of a defendant's mental age and condition, low IQ, limited education, and general condition. When a defendant alleges that his waiver or confession was involuntary, the question "is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess."

***Commonwealth v. Sepulveda***, 55 A.3d 1108, 1136-37 (Pa. 2012) (citations

omitted). When assessing the totality of the circumstances surrounding a

confession, other factors include

> the duration and methods of the interrogation; the length of delay
> between arrest and arraignment; the conditions of detainment;
> the attitudes of the police toward defendant; defendant's physical
> and psychological state; and all other conditions present which
> may serve to drain one's power of resist[a]nce to suggestion or to
> undermine one's self-determination.

***Chacko***, 459 A.2d at 317.

Instantly, the trial court explained its decision to deny Appellant's

motion to suppress as follows:

> Appellant's waiver was voluntary. Her IQ is 63 which is below
> normal, but her intellectual disability is merely one factor to
> consider when determining w[he]ther a statement was the
> product of coercion. Further, her verbal IQ is 67 which is quite
> close to the normal range. The DSM-V indicates that someone with
> this particular disability may need help making legal decisions.
> However, she was responsive and answering questions
> appropriately and [Detective] Trovy testified that she thought
> Appellant understood everything. Appellant was known to assert
> herself as a parent and in her own employment situations,
> indicating an ability to understand and act.
>
> The waiver made was with a full awareness of both the nature of
> the right being abandoned and the consequences of the decision
> to abandon it. Again, the DSM-V suggests a person may need help
> with legal decisions. However, when [Dr.] Blumberg interviewed
> her and asked her specifically about what each ***Miranda*** right
> meant, she was able to explain them overall and she did assert
> her rights when she surrendered to police in September. That later
> assertion of rights indicates, despite no change in her mental
> status, . . . that she was able to assert herself and understand
> what it meant.

Trial Ct. Op. at 9-10.

Although Appellant raises several alleged deficiencies in Dr. O'Brien's assessment, our review of the record reveals no basis to conclude that Dr. O'Brien's expert testimony as a whole was unreliable or unworthy of belief. Furthermore, as indicated above, the trial court did not base its ruling solely on Dr. O'Brien's assessment and expert opinion. Thus, Appellant's contention that the trial court abused its discretion by relying on Dr. O'Brien's testimony merits no relief. **See Clemens**, 66 A.3d at 378.

Moreover, the record establishes that the interview lasted approximately two hours in a conference room. Appellant was not handcuffed. Although there were two police officers present, Detectives Trovy and Iachini, there is no indication that their attitude toward Appellant was inappropriate or aggressive. Detective Trovy testified that she generally told Appellant that her prior innocent explanations for child's injuries did not "make sense" and would tell Appellant "that's not what happened." N.T. at 17, 34-35. The detective further stated that Appellant progressively took more responsibility throughout the interaction and appeared cooperative. **Id.** at 22.

In light of the foregoing, we discern no abuse of discretion in the trial court's factual findings. We also find no error in the trial court's conclusion that Appellant was capable of knowingly, intelligently, and voluntarily waiving her **Miranda** rights under the circumstances of this case. Although Appellant relies, in part, on **Reynolds**, we find that case distinguishable. **See Reynolds**, 446 A.2d at 272-73 (affirming suppression of confession by the trial court based on record evidence that the interrogating officer

psychologically coerced the defendant by implicating the defendant, threatening him with jail, and then telling him the police could help him stay out of jail if he confessed). Accordingly, we conclude that the trial court's denial of Appellant's suppression motion was proper. *See Mitchell*, 902 A.2d at 450-51; *Clemens*, 66 A.3d at 378.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/26/2018