J-S50042-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LERON FRANK HARRIS | |
| Appellant | No. 1451 MDA 2015 |

Appeal from the Judgment of Sentence June 26, 2015
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0004713-2014

BEFORE: MUNDY, J., STABILE, J., and FITZGERALD, J.[*]

MEMORANDUM BY MUNDY, J.: **FILED JULY 08, 2016**

Appellant, Leron Frank Harris, appeals from the June 26, 2015 aggregate judgment of sentence of two to five years' imprisonment, imposed after Appellant was found guilty of one count each of possession with intent to deliver (PWID), intentional possession of a controlled substance, and possession of drug paraphernalia.[1] After careful review, we affirm.

The trial court summarized the relevant factual history of this case as follows.

> At the hearing held on Appellant's Suppression
> Motion, the Commonwealth presented the testimony
> of Dauphin County Probation Officer Sean Hamor

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. §§ 780-113(a)(30), 780-113(a)(16), and 780-113(a)(32), respectively.

("PO Hamor") and Harrisburg City Police Officer Nicholas Ishman ("Ofc. Ishman"). At or about 7:53 p.m. on the evening of August 16, 2014, the Officers were partnered on routine patrol as part of the Dauphin County Street Crimes Unit ("SCU"). The SCU is a team of law enforcement officers consisting of police, county probation officers and state parole officers who patrol high crime areas and address any violent crimes or drug transactions that they encounter.

While on patrol, Ofc. Ishman and PO Hamor were driving in an unmarked police van on Woodbine Street in Harrisburg when they spotted Appellant standing with another mate, later identified as David Bucci, in Wharton Alley. When they turned the corner onto Wharton Alley, Ofc. Ishman, who was familiar with Appellant, saw money in his left hand and observed him put something down the front of his pants. Although he was not Appellant's supervising Probation Officer, PO Hamor was familiar with Appellant as he had seen him report to PO Anglemeyer. Ofc. Ishman reported to PO Hamor what he had seen so, the two decided to make contact with Appellant.

Ofc. Ishman and PO Hamor turned onto Wharton Alley without emergency lights or sirens activated. Upon exiting the police vehicle, Appellant walked up to Ofc. Ishman greeted him and shook his hand. [Ofc.] Ishman testified that he did not indicate to Appellant that he wanted to speak to him or that Appellant was not free to leave the scene. Ofc. Ishman then walked over to Mr. Bucci who was standing by his truck that was parked in the alley.

PO Hamor then exited the car to make a routine probation contact with Appellant. Appellant's demeanor was nervous and shaky. PO Hamor gave him a pen and paper to write down his name and probation officer's name and he continued to shake while performing the task. PO Hamor never told Appellant that he was not free to leave; rather, he asked for consent to search his person which consent

was granted. Approximately $200 in cash and a cellphone were found during the search. While searching him, PO Hamor shook Appellant's shorts which caused a rubber band to fall out which was spotted by Ofc. Ishman who was now standing about 5 feet away. Once he was alerted to the rubber band, PO Hamor asked Appellant if he had any contraband on him to which he replied no. PO Hamor followed up with a request for consent to search down his pants; Appellant agreed and unbuckled his belt. PO Hamor pulled the waistband away from Appellant's stomach and immediately saw a bag of suspected crack cocaine on top of his private parts. Appellant reacted by repeatedly saying "I'm done, I'm done." The substance found in Appellant's pants field tested positive as crack cocaine.

On August 16, 2014, around 6:00 p.m., David Bucci … called Appellant, a person he knew as "Ralph", to make arrangements to buy $20 worth of crack cocaine. Mr. Bucci had been in contact with Appellant numerous times prior to August 16, 2014, to purchase illegal drugs. He indicated that the usual practice was for him to call Appellant to see if he had cocaine available and, if so, meet on Wharton Street. On the date of the incident, the pair was to meet at approximately 7:00 p.m. on Wharton Street off Woodbine Street. Appellant instructed Bucci to call him when he arrived at the meeting spot so he could come out of his apartment building and consummate the drug transaction.

Bucci drove to the meeting location with his fiancée who waited in his truck. After notifying Appellant by phone that he had arrived, Appellant met with Bucci on the sidewalk outside of the apartment building on Wharton Alley. While making the exchange, Bucci and Appellant saw a police vehicle turn down the alley which caused them to go separate ways – Appellant towards his apartment building and Bucci to his truck.

After exiting the police vehicle, Ofc. Ishman approached Bucci and asked why he was there. Bucci lied at first about the reason for being at the location; however, he eventually admitted that he was there to buy drugs. Upon request, Bucci granted Ofc. Ishman permission to search his person but, according to Bucci, since he admitted to the reason for meeting with Appellant, the search never occurred. At trial, Bucci identified Appellant as the person named "Ralph" from whom he would purchase crack cocaine.

Ofc. Ishman's and PO Hamor's testimony was essentially the same as the testimony provided during the suppression hearing with further amplification of some details relating to the encounter with Appellant and Bucci. When Ofc. Ishman first spotted Bucci and Appellant, they were standing at the rear of the apartment building on Wharton Alley. He stated that the two men immediately stopped speaking and Appellant shoved something down his pants. After shaking Appellant's hand, he told Ofc. Ishman that the men were talking about a job. Ofc. Ishman then proceeded to speak with Bucci. Initially Bucci told Ishman that the pair had been talking about tattoos for his fiancée but, eventually he admitted that he was there for a cocaine purchase. After Bucci consented to a search of his person, Ofc. Ishman found no contraband.

PO Hamor was informed by Ofc. Ishman that he had seen Appellant shove something down his pants. PO Hamor made contact with Appellant after Ishman began speaking with Mr. Bucci. At trial, PO Hamor reiterated the details of his encounter with Appellant up to the point of the consensual search of his pants where the bag of suspected crack cocaine was found.

Ofc. Ishman took custody of the bag and field tested the substance. The substance recovered from Appellant field tested positive as cocaine. Ishman searched Appellant incident to the arrest after finding the baggie and recovered a cellphone and $205 in

- 4 -

the form of two $100 bills and a $5 bill. Ofc. Ishman got permission to use Mr. Bucci's cellphone to call the contact number listed as Ralph. Upon placing the call from Bucci's phone, Appellant's cellphone rang.

Ofc. Ishman submitted the recovered substance to the Pennsylvania State Police ("PSP") Forensic Lab for testing. The parties stipulated to the admission of the PSP lab report into evidence. The report indicated that the substance recovered from Appellant was crack cocaine that weighed 5.76 grams.

The Commonwealth also presented the expert testimony of Chief John Goshert ("Chief Goshert") of the Dauphin County Criminal Investigation Division ("CID"). After testifying to his training, experience and background, Chief Goshert was qualified as an expert in street level drug trafficking without objection.

Chief Goshert testified that he had reviewed the police report and the evidence related to this case. Chief Goshert was given a hypothetical upon which to determine whether he was able to form an opinion regarding whether the cocaine recovered in this matter was for personal use or for distribution. After considering the hypothetical factual scenario and reviewing the PSP lab report, Chief Goshert opined that the drugs recovered in this case were possessed with the intent to sell or deliver to another person.

Chief Goshert testified to the many factors which led him to his opinion which included his experience with significant drug trafficking at that location; the fact that the secreted area of the location eased the facilitation of a drug transaction; and, the actions of the two men were synonymous with persons engaging in a drug transaction. Chief Goshert found the significant amount of cocaine recovered along with the fact that a device by which a person may smoke the crack cocaine was not

found and packaging in which it was found are inconsistent with personal use. An additional factor considered was the presence of a significant amount of cash given Appellant's lack of employment.

Trial Court Opinion, 1/12/16, at 3-8.

Appellant filed a motion to suppress on December 23, 2014, for which the trial court conducted a hearing on January 26, 2015. After post-hearing briefing, the trial court entered an order on February 27, 2015, denying Appellant's motion to suppress.

Appellant proceeded to a jury trial on June 3, 2015, at the conclusion of which, the jury found Appellant guilty of intentional possession and drug paraphernalia counts, but deadlocked on PWID. Appellant proceeded to a second jury trial on June 11, 2015, limited to the one count of PWID, at the conclusion of which, the jury found Appellant guilty of that offense. On June 26, 2015, the trial court imposed an aggregate sentence of two to five years' imprisonment.[2] That same day, Appellant filed a timely post-sentence motion, which the trial court denied on August 10, 2015. On August 24, 2015, Appellant filed a timely notice of appeal.[3]

On appeal, Appellant raises the following four issues for our review.

_____

[2] Specifically, the trial court sentenced Appellant to two to five years' imprisonment for PWID, a concurrent six months' probation for possession of drug paraphernalia, and no further penalty on intentional possession.

[3] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

I.  Whether the trial court erred in denying Appellant's motion to suppress evidence where the police and probation officer lacked reasonable suspicion to conduct an investigative detention[,] in violation of Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution?

II.  Whether the trial court erred in denying Appellant's motion to suppress evidence where the police and probation officer lacked reasonable suspicion to conduct a probation search, in violation of Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution?

III.  Whether the trial court erred in denying Appellant's post-sentence motion where the verdict was against the weight of the evidence so as to shock one's sense of justice where the Commonwealth never showed that [] Appellant engaged in acts which constitute the offense of which he was convicted?

IV.  Whether the Commonwealth failed to present sufficient evidence to sustain Appellant's convictions where the Commonwealth did not prove that Appellant possessed the drugs with the intent to deliver them?

Appellant's Brief at 8-9 (some capitalization omitted).

We elect to address Appellant's issues in reverse order for ease of appellate review and analysis. *See generally Commonwealth v. Stokes*, 38 A.3d 846, 853 (Pa. Super. 2011) (stating, "a successful sufficiency of the evidence claim warrants discharge on the pertinent crime, [therefore,] we address those claims first[]"). In his fourth issue, Appellant avers that the Commonwealth failed to provide sufficient evidence of PWID, specifically that

he possessed the drugs in question with the intent to deliver. Appellant's Brief at 36-38. The Commonwealth counters that through Bucci and Chief Goshert, their testimony was sufficient to establish the "intent to deliver" element of the offense. Commonwealth's Brief at 31-32.

We begin by noting our well-settled standard of review. "In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt." *Commonwealth v. Patterson*, 91 A.3d 55, 66 (Pa. 2014) (citation omitted), *cert. denied*, *Patterson v. Pennsylvania*, 135 S. Ct. 1400 (2015). "The Commonwealth can meet its burden by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Watley*, 81 A.3d 108, 113 (Pa. Super. 2013) (*en banc*) (internal quotation marks and citation omitted), *appeal denied*, 95 A.3d 277 (Pa. 2014). As an appellate court, we must review "the entire record … and all evidence actually received[.]" *Id.* (internal quotation marks and citation omitted). "[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence." *Id.* (citation omitted). "Because evidentiary sufficiency is a question of law,

our standard of review is *de novo* and our scope of review is plenary."

***Commonwealth v. Diamond***, 83 A.3d 119, 126 (Pa. 2013) (citation omitted), *cert. denied,* ***Diamond v. Pennsylvania***, 135 S. Ct. 145 (2014).

In this case, the offense at issue is PWID, the statute governing said offense provides in relevant part, as follows.

### § 780-113. Prohibited acts; penalties

(a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:

…

(30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

…

35 P.S. § 780-113(a)(30). Regarding the intent to deliver element, this Court has explained that the jury may infer said intent from the following circumstances.

"To establish the offense of possession of a controlled substance with intent to deliver, the Commonwealth must prove beyond a reasonable doubt that the defendant possessed a controlled substance with the intent to deliver it." [***Commonwealth v. Kirkland***, 831 A.2d 607, 611 (Pa. Super. 2003), *appeal denied*, 847 A.2d 1280 (Pa. 2004)] (*citing* ***Commonwealth v. Conaway***, 791 A.2d 359 (Pa. Super. 2002); ***Commonwealth v. Aguado***, 760 A.2d 1181 (Pa. Super. 2000)).

- 9 -

The trier of fact may infer that the defendant intended to deliver a controlled substance from an examination of the facts and circumstances surrounding the case. Factors to consider in determining whether the drugs were possessed with the intent to deliver include the particular method of packaging, the form of the drug, and the behavior of the defendant.

*Kirkland*, *supra* at 611. "Thus, possession with intent to deliver can be inferred from the quantity of the drugs possessed and other surrounding circumstances, such as lack of paraphernalia for consumption." *Commonwealth v. Torres*, 617 A.2d 812, 814 (Pa. Super. 1992), *appeal denied,* 629 A.2d 1379 (Pa. 1993).

*Commonwealth v. Jones*, 874 A.2d 108, 121 (Pa. Super. 2005) (parallel citations omitted).

In this case, the Commonwealth presented the testimony of Bucci, who testified that he "basically [] bought [his] drugs from [Appellant]." N.T., 6/11/15, at 25. Bucci described Appellant's manner of conducting business in the following terms.

Q. When you would purchase these drugs, did you have any routine for getting them?

A. Yes.

Q. Can you please describe that to the members of the jury?

A. Basically I would call, I would ask if [Appellant] was good. He would [say] yes or no. If the answer was yes, I would -- we would proceed to make a time on how long it was going to take me to get there. I would get there, at which point I would call him again, and then he

- 10 -

> > would come out and the transaction would be made.
>
> > Q.    Now, you just stated that you would call [Appellant] and ask him if he was good. Can you please describe to the members of the jury what that means?
>
> > A.    Basically did he have drugs on him. Cocaine.
>
> > Q.    Would you always meet in the same location?
>
> > A.    Yes.

*Id.* at 25-26. Bucci further testified that on the night of August 16, 2014, he intended to purchase $20.00 worth of crack cocaine, and was in the middle of making that transaction with Appellant when the police interrupted them. *Id.* at 26, 28.

The Commonwealth also presented the testimony of Chief Goshert, who testified as an expert in the field of "street-level drug trafficking." *Id.* at 63. Chief Goshert testified that in his expert opinion, the 5.76 grams of crack cocaine recovered from Appellant's person was possessed with the intent to deliver and not for personal use. *Id.* at 66. Chief Goshert stated that several factors led him to this conclusion. This included that the area where Appellant and Bucci were found was "an area that is known for drug trafficking." *Id.* at 67. Also, Chief Goshert stated that the street value of the 5.76 grams of crack cocaine was "about 450 to 570 dollars [sic] worth" and it was "not an amount that would be consistent with someone who is using crack cocaine." *Id.* at 67-68. Chief Goshert also noted that Appellant

- 11 -

and Bucci's behavior of being "in the alley like that huddled up would be consistent with a drug transaction, with transactional behavior." *Id.* at 69. Chief Goshert also noted that Appellant was not found with any drug paraphernalia on his person, and that the packaging in which the crack cocaine was found in was consistent with the sale of the substance, as opposed to being for personal use. *Id.* at 72.

In light of the above evidence, we conclude Appellant is not entitled to relief. The Commonwealth's evidence showed that Appellant possessed 5.76 grams of crack cocaine, worth at least $450.00, and regularly sold the same to Bucci. As Chief Goshert explained, the location and behavior of Bucci and Appellant, combined with the value of the crack cocaine found, were all consistent with an intent to deliver. Furthermore, it is undisputed that at the time the police encountered Appellant, he did not possess any drug paraphernalia on his person, which would have indicated that the drugs were for personal consumption. Although, Appellant highlights factors that were not present, these do not detract from the fact that Chief Goshert and Bucci's testimony presented facts from which a jury could conclude that Appellant possessed the crack cocaine with an intent to deliver. *See, e.g.*, *Kirkland*, *supra*; *Torres*, *supra*. Based on these considerations, we conclude the Commonwealth produced sufficient evidence of intent to sustain the PWID conviction. *See Diamond*, *supra*; *Jones*, *supra*.

In his third issue, Appellant avers that the jury's verdict was against the weight of the evidence.[4] We begin by noting our well-settled standard of review. "A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court." *Commonwealth v. Landis*, 89 A.3d 694, 699 (Pa. Super. 2014) (citation omitted). An argument that the jury's verdict was against the weight of the evidence concedes that the evidence was sufficient to sustain the convictions. *Commonwealth v. Lyons*, 79 A.3d 1053, 1067 (Pa. 2013), *cert. denied*, *Lyons v. Pennsylvania*, 134 S. Ct. 1792 (2014). Our Supreme Court has admonished that "[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citation omitted). Instead, "the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Id.* (internal quotation marks and citation omitted). "[A] new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice …." *Id.*

As an appellate court, it "is not [our role] to consider the underlying question of whether the verdict is against the weight of the evidence."

---

[4] We reject the trial court and the Commonwealth's position that Appellant has waived this issue for want of specificity.

*Commonwealth v. Morales*, 91 A.3d 80, 91 (Pa. 2014) (citation omitted), *cert. denied*, *Morales v. Pennsylvania*, 135 S. Ct. 1548 (2015). An argument that the jury's verdict was against the weight of the evidence remains "[o]ne of the least assailable reasons for granting … a new trial …." *Id.* (citation omitted). "Thus, only where the facts and inferences disclose a *palpable abuse of discretion* will the denial of a motion for a new trial based on the weight of the evidence be upset on appeal." *Id.* (citation omitted; emphasis in original).

In this case, Appellant avers the jury's verdict was against the weight of the evidence because, in his view, Bucci and Chief Goshert's testimony was unreliable. Appellant argues that Bucci's testimony was unreliable because of his *crimen falsi*, pending charges, and his admission that he lied to the police. Appellant's Brief at 40. Appellant also assails Bucci's testimony for its purported inconsistency with the evidence. Appellant maintains that although Bucci stated that he purchased the $20.00 worth of crack cocaine from Appellant, Bucci was not found with any drugs on him, nor was Appellant found with any "denominations [of currency] … that would account for twenty ($20) dollars." *Id.* at 41. Appellant also avers that Chief Goshert's conclusions were unreliable because he testified that he did not know whether Appellant had drug paraphernalia in his home 50 feet from where he met Bucci. *Id.* Appellant also notes that Chief Goshert agreed

that buying crack cocaine in a bulkier quantity was "safer and that the drugs would not go bad so one could keep them for a long period of time." ***Id.***

The trial court concluded that Appellant was not entitled to relief based on two propositions. First, it concluded the record contained "an abundance of evidence [that] was presented to prove an intent to deliver the crack cocaine." Trial Court Opinion, 1/12/16, at 18. Second, the trial court's "[r]eview of the transcript does not reveal such [an] amount of inconsistencies or a lack of credibility that it would shock the [trial c]ourt's sense of justice to learn that the jury resolved any credibility issues in favor of the Commonwealth." ***Id.***

It is axiomatic that the jury is the ultimate finder of fact at trial.

> [T]he veracity of a particular witness is a question which must be answered in reliance on the ordinary experiences of life, common knowledge of the natural tendencies of human nature, and observations of the character and demeanor of the witness. As the phenomenon of lying is within the ordinary capacity of jurors to assess, the question of a witness's credibility is reserved exclusively for the jury.

***Commonwealth v. Alicia***, 92 A.3d 753, 761 (Pa. 2014) (citation omitted). Likewise, "[t]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." ***Commonwealth v. Feese***, 79 A.3d 1101, 1122 (Pa. Super. 2013), *appeal denied*, 94 A.3d 1007 (Pa. 2014).

In this case, as the trial court pointed out, the jury was free to find Bucci and Chief Goshert's trial testimony credible, and resolve any inconsistencies in said testimony in the Commonwealth's favor. *See generally Commonwealth v. Horne*, 89 A.3d 277, 286 (Pa. Super. 2014) (concluding the weight of the evidence claim could not prevail as "the jury resolved the inconsistencies among the testimonies as it saw fit and reached a verdict[]"), *appeal denied*, 102 A.3d 984 (Pa. 2014). The jury weighed their testimony and ultimately concluded that Bucci and Chief Goshert were credible. As an appellate court, we will not reweigh the evidence and substitute our judgment for that of the fact-finder. *Commonwealth v. Serrano*, 61 A.3d 279, 289 (Pa. Super. 2013) (citation omitted). Based on these considerations, we conclude the trial court did not commit a palpable abuse of discretion in deciding the jury's verdict was not against the weight of the evidence. *See Morales*, *supra*.

We address Appellant's remaining two issues together, in which Appellant argues the trial court erred when it denied his motion to suppress. We begin by noting our well-settled standard of review.

> In addressing a challenge to a trial court's denial of a suppression motion, we are limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the Commonwealth prevailed in the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as it remains uncontradicted when read in the context of the

> record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

***Commonwealth v. Scarborough***, 89 A.3d 679, 683 (Pa. Super. 2014) (citation omitted), *appeal denied*, 102 A.3d 985 (Pa. 2014).[5] In his first issue, Appellant argues the police lacked reasonable suspicion to conduct an investigative detention of Appellant. Appellant's Brief at 19. The Commonwealth counters that the interaction was a mere encounter, but even if it was an investigative detention, the police had reasonable suspicion. Commonwealth's Brief at 14, 20.

> The Fourth Amendment of the Federal Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated …." U.S. Const. amend. IV. Likewise, Article I, Section 8 of the Pennsylvania Constitution

---

[5] Our Supreme Court has clarified our scope of review when considering a challenge to a trial court's suppression ruling as it relates to "the extent of the record that the appellate court consults when conducting that review." ***In re L.J.***, 79 A.3d 1073, 1080 (Pa. 2013). The Court held that such review is limited to the suppression hearing record, and "it is inappropriate to consider trial evidence as a matter of course, because it is simply not part of the suppression record, absent a finding that such evidence was unavailable during the suppression hearing." ***Id.*** at 1085. Because prior cases held that a reviewing court could consider the trial record in addition to the suppression record, our Supreme Court determined that the more limited scope announced in ***In re L.J.*** would apply prospectively to cases where the suppression hearing occurred after October 30, 2013. ***Id.*** at 1088-1089. Instantly, the subject suppression hearing was held on January 26, 2015. Accordingly, our scope of review is confined to the suppression hearing record.

> states, "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures …." Pa. Const. Art. I, § 8.
>
> *Commonwealth v. Carter*, 105 A.3d 765, 768 (Pa. Super. 2014) (*en banc*), *appeal denied*, 117 A.3d 295 (Pa. 2015).

*Commonwealth v. Williams*, 125 A.3d 425, 432 (Pa. Super. 2015). Our cases have recognized three levels of police-citizen interactions.

> The first is a mere encounter, which requires no level of suspicion at all. *Commonwealth v. Daniel*, 999 A.2d 590, 596 (Pa. Super. 2010). The second level is an investigative detention, which must be supported by reasonable suspicion. *Id.* at 596-597. Finally, the third level is an arrest or custodial detention, which must be supported by probable cause. *Id.* at 597.

*Commonwealth v. Walls*, 53 A.3d 889, 892-893 (Pa. Super. 2012). "In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances." *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (citation omitted).

> The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and this Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

- 18 -

*Id.* at 302-303.

In the case *sub judice*, the Commonwealth presented the testimony of Officer Ishman, who testified that he was patrolling in an unmarked car with P.O. Hamor. N.T., 1/26/15, at 16-17. Officer Ishman testified that at about 7:53 p.m., he and P.O. Hamor were driving by Wharton Alley, when he saw Appellant. *Id.* at 17, 18. Officer Ishman observed that Appellant had money in his left hand, and he was speaking to Bucci. *Id.* at 18. Officer Ishman also observed Appellant "put something down the front of his pants." *Id.* at 19. Officer Ishman knew Appellant and identified him to P.O. Hamor. The two officers got out of the car, which had neither its lights or sirens activated. *Id.* at 19. As Officer Ishman got out of the car, Appellant walked over to him. *Id.* Officer Ishman shook his hand, asked him how he was doing that evening. *Id.* Appellant responded he was fine and had been speaking to Bucci "about doing some work." *Id.* Officer Ishman then turned and went to speak to Bucci. *Id.* at 19-20.

P.O. Hamor testified at the suppression hearing that after Officer Ishman and Appellant shook hands and exchanged greetings, he also introduced himself to Appellant and asked him what he was doing. *Id.* at 8. Appellant responded to P.O. Hamor that he was talking to Bucci about a job. *Id.* P.O. Hamor described Appellant as acting nervously, with his hands shaking. *Id.* at 9. P.O. Hamor gave Appellant his pen and notepad to write down his name and his supervising probation officer. *Id.* P.O. Hamor

explained that even though he already knew this information, he made the request to illustrate Appellant's nervousness. *Id.* P.O. Hamor asked Appellant if he could search his person, to which Appellant said yes. *Id.* at 10. P.O. Hamor recovered over $200.00 in currency and a mobile phone. *Id.* When P.O. Hamor was "shaking out his pants" as part of the search, "a rubber band fell out on the ground." *Id.* Officer Ishman pointed out that it came out of Appellant's pants. *Id.* P.O. Hamor asked Appellant if he "had anything on him[]" to which Appellant said no. *Id.* P.O. Hamor asked Appellant for his consent to search his pants. *Id.* Appellant unbuckled his belt, and P.O. Hamor pulled Appellant's pants away from his stomach. P.O. Hamor observed the crack cocaine on top of Appellant's genitals. *Id.*

Looking at the circumstances, we conclude that at the relevant times, Appellant was subjected to a mere encounter, and not an investigative detention. Both the United States Supreme Court and our Supreme Court have held that a request for identification by police does not itself amount to a seizure within the meaning of the Fourth Amendment. *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 185 (2004); *Commonwealth v. Au*, 42 A.3d 1002, 1007 (Pa. 2012). In addition, our Supreme Court has instructed that an investigative detention arises when "an encounter involving a request for identification could rise to a detention when coupled with circumstances of restraint of liberty, physical force, show of authority, or some level of coercion beyond the officer's mere employment, conveying

a demand for compliance or that there will be tangible consequences from a refusal." **Lyles**, **supra** at 304. Here, the officers were pulled up in an unmarked vehicle without lights or sirens and were approached initially by Appellant himself. The officers then exchanged greetings and shook hands with Appellant and inquired into his name and activities. In our view, there was no identifiable "restraint of liberty, physical force, show of authority, or … coercion" that escalated this mere encounter into anything more than just that. **Id.** Therefore, we conclude that Appellant was not subjected to a seizure within the meaning of the Fourth Amendment.[6] **See Walls**, **supra**.

In his second issue, Appellant claims the police lacked reasonable suspicion to conduct a "probation search." **Id.** at 28. However, the trial court concluded that Appellant consented to the search at issue, as such, no reasonable suspicion was required. Trial Court Opinion, 1/12/16, at 13. Appellant does not challenge the trial court's consent conclusion except to say that "[t]he fact that Appellant allegedly consented to th[e] search is irrelevant as the consent would have occurred after the illegal detention."

_____

[6] Although the Commonwealth argued in the trial court that Appellant was subjected to a mere encounter, it appears the trial court's overriding conclusion was that the officers possessed reasonable suspicion. Trial Court Opinion, 1/12/16, at 12. It is unclear whether the trial court was affirmatively rejecting the Commonwealth's position that this was a mere encounter, or was assuming that even if it was a seizure, it was constitutional. Nevertheless, as an appellate court, we "may affirm [the lower court] for any reason, including such reasons not considered by the lower court." **Commonwealth v. Clemens**, 66 A.3d 373, 381 n.6 (Pa. Super. 2013) (citation omitted).

Appellant's Brief at 36. As we have explained above, Appellant's Fourth Amendment rights were not violated. Appellant does not raise any other argument challenging the trial court's consent conclusion; as a result, we conclude this issue lacks merit. Therefore, as Appellant's two suppression issues fail, the trial court correctly denied Appellant's motion to suppress. *See Scarborough*, *supra*.

Based on the foregoing, we conclude all of Appellant's issues are devoid of merit. Accordingly, the trial court's June 26, 2015 judgment of sentence is affirmed.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/8/2016